FEDERAL TRADE COMMISSION *v.* SINCLAIR
REFINING COMPANY.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE
SEVENTH CIRCUIT.

FEDERAL TRADE COMMISSION *v.* STANDARD
OIL COMPANY (NEW JERSEY).

FEDERAL TRADE COMMISSION *v.* GULF REFIN-
ING COMPANY.

FEDERAL TRADE COMMISSION *v.* MALONEY OIL
& MANUFACTURING COMPANY.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE
THIRD CIRCUIT.

Nos. 213, 637, 638, 639.  Argued March 8, 9, 1923.—Decided April 9,
1923.

1. The practice, upon the part of a manufacturer of gasoline, of leasing underground tanks with pumps to retail dealers, at nominal rentals and upon condition that the equipment shall be used only with gasoline supplied by the lessor, is not in violation of the Clayton Act.  P. 473.

2. Nor is it unfair competition, within the Federal Trade Commission Act, as regards either the trade in gasoline or the trade in such storage and pumping equipment. P. 474.

3. The Federal Trade Commission has no general authority to compel competitors to a common level, to interfere with ordinary business methods, or to restrict competition to arbitrary standards. P. 475.

4. The great purpose of both of the above statutes was to advance the public interest by securing fair opportunity for the play of contending forces engendered by an honest desire for gain; and to this end it is essential that those who adventure their time, skill and capital should have large freedom of action in the conduct of their own affairs. P. 476.

276 Fed. 686; 282 Fed. 81, affirmed.

CERTIORARI to four judgments of Circuit Courts of Appeals setting aside as many orders of the Federal Trade Commission.

Mr. Adrien F. Busick and Mr. Eugene W. Burr, with whom Mr. Solicitor General Beck and Mr. W. H. Fuller were on the briefs, for petitioner.

Mr. Roy T. Osborn, with whom Mr. Edw. H. Chandler and Mr. W. Ray Allen were on the brief, for respondent in No. 213.

Mr. Charles D. Chamberlin, with whom Mr. Hubert B. Fuller was on the brief, for respondent in No. 639.

Mr. R. L. Batts, with whom Mr. W. J. Guthrie was on the brief, for respondent in No. 638.

Mr. Chester O. Swain and Mr. James H. Hayes, for respondent in No. 637, submitted.

MR. JUSTICE McREYNOLDS delivered the opinion of the Court:

In separate proceedings against thirty or more refiners and wholesalers, the Federal Trade Commission condemned and ordered them to abandon the practice of leas-

ing underground tanks with pumps to retail dealers at nominal prices and upon condition that the equipment should be used only with gasoline supplied by the lessor. Four of these orders were held invalid by the circuit courts of appeals for the third and seventh circuits in the above entitled causes—276 Fed. 686; 282 Fed. 81; and like ones have been set aside by the circuit courts of appeals for the second and sixth circuits—*Standard Oil Co.* v. *Federal Trade Commission,* 273 Fed. 478; *Canfield Oil Co.* v. *Federal Trade Commission,* 274 Fed. 571. The proceedings, essential facts and points of law disclosed by the four records now before us are so similar that it will suffice to consider No. 213, as typical of all.

July 18, 1919, the Commission issued a complaint charging that respondent, Sinclair Refining Company, was purchasing and selling refined oil and gasoline and leasing and loaning storage tanks and pumps as part of interstate commerce in competition with numerous other concerns similarly engaged; and that it was violating both the Federal Trade Commission Act, 38 Stat. 717, and the Clayton Act, 38 Stat. 730.

The particular facts relied on to show violation of the Federal Trade Commission Act are thus alleged—

" Paragraph Three. That respondent in the conduct of its business, as aforesaid, with the effect of stifling and suppressing competition in the sale of the aforesaid products and in the sale, leasing, or loaning of the aforesaid devices and other equipments for storing and handling the same, and with the effect of injuring competitors who sell such products and devices, has within the four years last past sold, leased, or loaned and now sells, leases, or loans the said devices and their equipment for prices or considerations which do not represent reasonable returns on the investments in such devices and their equipments; that many such sales, leases, or loans of the aforesaid devices are made at prices below the cost of producing and vend-

ing the same; that many of such contracts for the lease or
loan of such devices and their equipments provide or are
entered into with the understanding that the lessee or
borrower shall not place in such devices, or use in con-
nection with such devices and their equipments, any re-
fined oil or gasoline of a competitor; that only a small
proportion of the dealers in gasoline and refined oil under
such agreements and understandings deal also in similar
products of respondent's competitors and that only a
small proportion of such dealers require or use more than
a single pump outfit in the conduct of their said business;
that there are numerous competitors in the sale of such
products who are unable to enter into such lease agree-
ments or understandings because of the large amount of
investment required to carry out such lease agreements
as a competitive method of selling refined oil and gaso-
line; that there are numerous other competitors of re-
spondent engaged in the manufacture and sale of de-
vices and their equipments who do not deal in refined oil
and gasoline, and therefore do not sell or lease said devices
and their equipments for a nominal consideration on a
condition or understanding that their products only are
to be used therein; that the said numerous competitors
who were unable to enter into such lease agreements or
understandings, as aforesaid, have lost numerous custom-
ers in the sale of refined oil and gasoline to respondent
because of the business practices of respondent hereinbe-
fore set forth. That the said numerous other competitors
of respondent who manufacture and sell said devices and
their equipments, but do not sell refined oil and gasoline,
as aforesaid, have lost numerous customers and pros-
pective customers for the purchase of their devices and
equipments because of the said business practices of re-
spondent, as hereinbefore set forth."

To show violation of the Clayton Act the complaint
alleged—

" Paragraph Three. That the respondent, for four years last past, in the conduct of its business as aforesaid, has leased and made contracts for the lease and is now leasing and making contracts for the lease of said devices and their equipments to be used within the United States, and has fixed and is now fixing the price charged therefor on the condition, agreement, or understanding that the lessees thereof shall not purchase or deal in the products of a competitor or competitors of respondent; and that the effect of such leases or contracts for lease, and conditions, agreements, or understandings, may be and is to substantially lessen competition and tend to create a monopoly in the territories and localities where such contracts are operative."

Respondent answered and evidence was taken. In October, 1919, the Commission announced its report, findings and conclusions, the substance of which follows.

" 1. That the respondent is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Maine, with its principal business office located at the City of Chicago, in the State of Illinois, and is now and has been engaged in the business of purchasing and selling refined oil and gasoline, hereinafter referred to as products, and is largely engaged in refining crude petroleum, and that it is now and has been since January 25, 1917, in connection with the aforementioned business, engaged in the leasing and loaning, but not in the manufacture, of oil pumps, storage tanks, and containers and their equipment, hereinafter referred to as devices, in various States of the United States, but not in the District of Columbia, in competition with numerous other persons, firms, corporations, and copartnerships similarly engaged; that prior to the 25th day of January, 1917, the corporate name of respondent was the Cudahy Refining Company.

" 2. That the respondent, in the conduct of its business, as aforesaid, and as hereinafter more particularly de-

scribed, extensively refines petroleum .and its products
and purchases refined oil and gasoline, all hereinafter
referred to as 'products,' and also .purchases oil pumps,
storage tanks or containers, hereinafter referred to as
'devices,' the said devices being used to contain said prod-
ucts, the said products and devices then being handled
and stored in the various States of the United States
and being transported in interstate commerce; that the
aforesaid products are sold and the aforesaid devices are
leased or loaned by respondent to various persons, firms,
corporations, and copartnerships; that in the conduct of
its business of purchasing and selling such products and
selling, leasing or loaning such devices, the same are con-
stantly moved from one State to another by respondent
and there is conducted by respondent a constant current
of trade in such products and devices between various
States of the United States; that there are numerous com-
petitors of respondent, who, in the conduct of their busi-
ness in competition with respondent, purchase similar
products and purchase and manufacture similar devices,
the said devices being used to contain said products, the
said products and devices then being handled and stored
in the various States of the United States and transported
in interstate commerce; that the aforesaid products are
sold and the aforesaid devices sold, leased, or loaned by
such competitors of respondent to various persons, firms,
corporations, and copartnerships, that in the conduct of
their business, as aforesaid, competitors of respondent
constantly move such products and devices from one State
to another and there is conducted by said competitors a
constant current of trade in such products and devices
between the various States of the United States; that
respondent has conducted its said business in a similar
manner to that above described since January 25, 1917.

"3. That respondent now leases and loans and has for
the period of its business existence leased and loaned

devices and equipment for storing and handling its products, and that the monetary considerations received by respondent do not represent reasonable returns upon the investment in such devices and equipment; and also that such leases and loans of said devices and equipment are made for monetary considerations below the cost of purchasing and vending the same when the business of leasing or loaning said devices and equipment and the returns received thereon are considered separate and apart from the general business and sales policy of the respondent; that respondent's form of contract with the users of such devices and equipment provides in substance that the devices and equipment shall be used for the sole purpose of storing and handling gasoline supplied by respondent, and that the uniform contract used by respondent for leasing such devices and equipment is in form, tenor, and substance as follows." [The ordinary form of contract (printed in the margin [1]) is here set out. It recites the

---

[1] Equipment Contract.

This agreement, made and entered into this......day of ........:, 19...., between Sinclair Refining Company of ...................., party of the first part, and ....:........., of the City of.........., State of .........., party of the second part, witnesseth:

Whereas, party of the second part is now being supplied with gasoline by the party of the first part and desires to install on his premises situated at.................the following equipment for the better storing and handling of such gasoline:............

Now, therefore, in consideration of the premises and of the sum of one dollar by the party of the second part to the party of the first part (the receipt of which is hereby acknowledged), the above named parties do hereby agree as follows:

1. The above described equipment shall be used by the party of the second part for the sole purpose of storing and handling the gasoline supplied by the party of the first part.

2. The party of the second part agrees, at his own cost, to maintain said equipment in good condition and repair so long as he shall continue to use the same.

3. The party of the second part agrees that he will not encumbe or remove said equipment, or do or suffer to be done anything

customer's desire to install certain equipment and, among other things, provides that this shall be used only for storing and handling gasoline supplied by the lessor; that

whereby said equipment or any part thereof may be seized, taken on execution, attached, destroyed or injured, or by which the title of the party of the first part thereto may in any way be altered, destroyed or prejudiced.

4. In the event party of the second part should at any time use said equipment for any other purpose than the storing and handling of gasoline supplied by the party of the first part, or should cease for........days to handle gasoline secured from the party of the first part the right or license of the party of the second part to said equipment shall at once terminate, and thereupon the party of the first part shall have the right to enter upon said premises and remove said equipment and every part thereof.

5. The party of the second part shall indemnify and save harmless the party of the first part to and from any liability for loss, damage, injury or other casualty to persons or property caused or occasioned by any leakage, fire or explosion of gasoline stored in said tank or drawn through said pump.

6. This agreement shall terminate forthwith upon the sale or other disposition of said premises by party of the second part, and in any event upon the expiration of.........months from the date hereof; and in the event that by mutual consent said equipment remains in the possession of the party of the second part at the expiration of said period, it is agreed that the same shall be used by party of the second part subject to all of the terms and conditions of this agreement, and such may be terminated at any time after the expiration of...........months from the date hereof by the party of the first part giving ten days' notice to that effect. Upon the termination of this license by whatever means effected, the party of the first part shall have the right to enter upon said premises and remove the said equipment and each and every part thereof; provided, however, that the party of the second part shall have the right and option at such time to purchase said equipment by paying therefor the sum of.....

This contract is executed in triplicate, and it is agreed that the contract held by the party of the first part is to be considered the original and to be the binding agreement in case the duplicate varies from it in any particular.

In witness whereof, the parties hereto have caused this agreement to be executed the day and year first above written.

if put to any other use the lessee's right therein shall terminate; and that upon termination of the lease, by whatever means effected, the lessee may purchase the equipment for a specific sum.]

"4. That the contracts mentioned in the preceding paragraph also provide that such equipments shall be used by the lessee only for the purpose of holding and storing the respondent's petroleum products; that a small proportion of such lessees handle similar products of respondent's competitors; and that only a small proportion of such lessees as handle similar products of respondent's competitors require or use more than a single pump outfit in the conduct of their said business; that the practice of leasing such devices requires a large capital investment; that many competitors of respondent do not possess sufficient capital and are not able to purchase and lease devices as respondent does as aforesaid, partly by reason of which such competitors have lost numerous customers to respondent; that the effect of the practice of leasing by contract such equipments, where such contracts contain the said provision restricting the use of the same to the storage and handling of respondent's products as aforesaid, may be to substantially lessen competition and tend to create for the respondent a monoply in the business of selling petroleum products.

"*Conclusions.* That the methods of competition and the business practices set forth in the foregoing findings as to the facts are, under the circumstances set forth herein, unfair methods of competition, in interstate commerce, in violation of the provisions of section 5 of an act of Congress, approved September 26, 1914, entitled 'An act to create a Federal Trade Commission, to define its powers and duties, and for other purposes,' and are in violation of section 3 of an act of Congress, approved October 15, 1914, entitled 'An act to supplement existing laws against unlawful restraints and monopolies, and for other purposes.'"

Thereupon the Commission ordered that respondent cease and desist from—

" 1. Directly or indirectly leasing pumps or tanks or both and their equipments for storing and handling petroleum products in the furtherance of its petroleum business, at a rental which will not yield to it a reasonable profit on the cost of the same after making due allowance for depreciation and other items usually considered when leasing property for the purpose of obtaining a reasonable profit therefrom, and from doing any matter or thing which would have the same unlawful effect as that resulting from the practice herein prohibited and by reason of which this order is made.

" 2. Entering into contracts or agreements with dealers of its petroleum products or from continuing to operate under any contract or agreement already entered into whereby such dealers agree or have an understanding that as a consideration for the leasing to them of such pumps and tanks and their equipments the same shall be used only for storing or handling the products of respondent, and from doing anything having the same unlawful effect as that resulting from the practice herein prohibited and by reason of which this order is made."

The Clayton Act provides—

" SEC. 3. That it shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies or other commodities, whether patented or unpatented, for use, consumption or resale within the United States or any territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, sup-

plies or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

Respondent's written contract does not undertake to limit the lessee's right to use or deal in the goods of a competitor of the lessor, but leaves him free to follow his own judgment. It is not properly described by the complaint and is not within the letter of the Clayton Act. But counsel for the Commission insist that inasmuch as lessees generally—except garage men in the larger places—will not encumber themselves with more than one equipment, the practical effect of the restrictive covenant is to confine most dealers to the products of their lessors; and we are asked to hold that, read in the light of these facts, the contract falls within the condemnation of the statute. · *Standard Fashion Co.* v. *Magrane-Houston Co.,* 258 U. S. 346, and *United Shoe Machinery Corporation* v. *United States,* 258 U. S. 451, are relied upon.

In the *Standard Fashion Co. Case* the purchaser expressly agreed not to sell or permit sale of any other make of patterns on its premises. It had a retail store in Boston and sales elsewhere were not within contemplation of the parties. This Court construed the contract as embodying an undertaking not to sell other patterns. In *United Shoe Machinery Corporation* v. *United States,* when speaking of certain " tying " restrictions, this Court said—

" While the clauses enjoined do not contain specific agreements not to use the machinery of a competitor of the lessor, the practical effect of these drastic provisions is to prevent such use. We can entertain no doubt that such provisions as were enjoined are embraced in the broad terms of the Clayton Act which cover all condi-

tions, agreements or understandings of this nature. That such restrictive and tying agreements must necessarily lessen competition and tend to monopoly is, we believe, equally apparent. When it is considered that the United Company occupies a dominating position in supplying shoe machinery of the classes involved, these covenants signed by the lessee and binding upon him effectually prevent him from acquiring the machinery of a competitor of the lessor except at the risk of forfeiting the right to use the machines furnished by the United Company which may be absolutely essential to the prosecution and success of his business. This system of 'tying' restrictions is quite as effective as express covenants could be and practically compels the use of the machinery of the lessor except upon risks which manufacturers will not willingly incur."

There is no covenant in the present contract which obligates the lessee not to sell the goods of another; and its language cannot be so construed. Neither the findings nor the evidence show circumstances similar to those surrounding the " tying " covenants of the Shoe Machinery Company. Many competitors seek to sell excellent brands of gasoline and no one of them is essential to the retail business. The lessee is free to buy wherever he chooses; he may freely accept and use as many pumps as he wishes and may discontinue any or all of them. He may carry on business as his judgment dictates and his means permit, save only that he cannot use the lessor's equipment for dispensing another's brand. By investing a comparatively small sum, he can buy an outfit and use it without hindrance. He can have respondent's gasoline, with the pump or without the pump, and many competitors seek to supply his needs.

The cases relied upon are not controlling.

Is the challenged practice an unfair method of competition within the meaning of § 5 of the Federal Trade

Commission Act?[1]   Reviewing the circumstances, four circuit courts of appeals have answered, no.  And we can find no sufficient reason for a contrary conclusion.  Certainly the practice is not opposed to good morals because characterized by deception, bad faith, fraud or oppression. *Federal Trade Commission* v. *Gratz,* 253 U. S. 421, 427. It has been openly adopted by many competing concerns. Some dealers regard it as the best practical method of preserving the integrity of their brands and securing wide distribution.  Some think it is undesirable.  The devices are not expensive—$300 to $500—can be purchased readily of makers and, while convenient, they are not essential.  The contract, open and fair upon its face, provides an unconstrained recipient with free receptacle and pump for storing, dispensing, advertising and protecting the lessor's brand.  The stuff is highly inflammable and the method of handling it is important to the refiner.  He is also vitally interested in putting his brand within easy reach of consumers with ample assurance of its genuineness.  No purpose or power to acquire unlawful monopoly has been disclosed, and the record does not show that the probable effect of the practice will be unduly to lessen competition.  Upon the contrary, it appears to have promoted the public convenience by inducing many small dealers to enter the business and put gasoline on sale at the crossroads.

The powers of the Commission are limited by the statutes.  It has no general authority to compel competitors to a common level, to interfere with ordinary business methods or to prescribe arbitrary standards for those en-

---

[1] Sec. 5. That unfair methods of competition in commerce are hereby declared unlawful.

The commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, and common carriers subject to the Acts to regulate commerce, from using unfair methods of competition in commerce.

gaged in the conflict for advantage called competition. The great purpose of both statutes was to advance the public interest by securing fair opportunity for the play of the contending forces ordinarily engendered by an honest dèsire for gain. And to this end it is essential that those who adventure their time, skill and capital should have large freedom of action in the conduct of their own affairs.

The suggestion that the assailed practice is unfair because of its effect upon the sale of pumps by their makers is sterile and requires no serious discussion.

The judgments below must be

*Affirmed.*