## BUTTERICK PUB. CO. et al. v. FEDERAL TRADE COMMISSION.

### Nos. 230, 240, 275.

Circuit Court of Appeals, Second Circuit.

Aug. 13, 1936.

Chester W. Johnson and Dan J. O'Connell, both of Minneapolis, Minn., for petitioner Midwest Distributors, Inc.

Robert Maloney, of New York City, for petitioner Frank A. Munsey Co.

Joseph Schultz, of New York City, for petitioner MacFadden Publications, Inc., and Street & Smith Publications, Inc.

Manheim Rosenzweig, of New York City, for petitioners Pictorial Review Co., and International Circulation Co., Inc.

Whitman, Ransom, Coulson & Goetz, of New York City (George W. Hufsmith, of New York City, of counsel), for petitioner S-M News Co., Inc.

W. T. Kelley, Chief Counsel, Federal Trade Commission, Martin A. Morrison, Asst. Chief Counsel, both of Washington, D. C., and Robert N. McMillen and James W. Nichol, Sp. Attys., both of Washington, D. C., for respondent.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The petitioners were charged in a complaint filed by the Commission with using unfair methods of competition within the scope of section 5 of the Federal Trade Commission Act (15 U.S.C.A. § 45). They all answered and appeared at hearings before a trial examiner at New York and at Boston, where evidence was introduced in support of the complaint. At the close of these hearings, the petitioners (then respondents) filed a motion to dismiss the complaint for lack of evidence to support it, but the motion was overruled with leave to renew upon final argument. At a hearing later called for the introduction of evidence by the respondents, they all waived their right to offer proof and insisted upon their motion to dismiss. The cause was argued before the Commission, and upon the record made it found the facts and reached conclusions thereon upon which the order to cease and desist under review was made. This order provided that respondents, "their agents, employees and representatives, in connection with the sale and distribution of magazines and other periodical publications in interstate commerce, forthwith cease and desist from the following acts and practices;

"(a) By agreement, combination or concert of action among themselves, or between or among any two or more of them, or with others, preventing or seeking to prevent any person, firm or corporation lawfully owning the same, from selling to distributors thereof or dealers therein, second-hand or back number magazines or other periodical publications; or

"(b) By agreement, combination or concert of action among themselves, or between or among any two or more of them, or with others, preventing, or seeking to prevent, or causing or seeking to cause wholesalers of magazines to prevent, newsdealers or other retailers of magazines from buying and selling or dealing in second-hand or back number magazines or other periodical publications, or in any manner interfering with the business of distributors of or dealers in such second-hand or back number magazines or other periodical publication.

"Provided, however, that nothing in this order contained shall prevent respondents from making such agreement or arrangements with, or taking such action against, wholesalers and retailers of their magazines or other periodical publications, as may be reasonably necessary to prevent unsold publications, for which respondents have reimbursed or credited such wholesalers or retailers, from being again placed on sale as reading matter."

On sufficient supporting evidence the Commission found that all these petitioners were corporations duly organized under the laws of New York, except the Pictorial Review Company, which is a Delaware corporation, and Midwest Distributors, Inc., a South Dakota corporation. During all material times, the principal place of business of each petitioner was in the city of New York. All but International Circulation Company, Inc., S-M News Company, and Midwest Distributors, Inc., were "engaged in the printing and publishing of periodical magazines and other periodical publications and in selling the same into and among the various states and territories of the United States and the District of Columbia." Those last above named were engaged in the sale and distribution of such magazines in the same territory. For convenience all the petitioners will hereafter be called publishers and all the periodicals will be called magazines. All of the publishers have caused magazines to be shipped in interstate commerce to the purchasers or consignees thereof, and there has been during all the time material a constant current of trade and commerce in such magazines between and among the various states and territories of the United States and the District of Columbia. All the publishers "are now, and at all times hereinafter mentioned have been, in substantial competition in interstate commerce

among themselves and with other publishers and sellers of magazines * * *, and with distributors of second-hand or back-number magazines as hereinafter set forth." The aggregate business of these respondents (petitioners) amounts to substantially more than twelve million copies of each issue."

The magazines so transported in interstate commerce are sold to wholesalers for the most part by the publishers, though some are sold direct to retailers consisting mainly of newsstands and drugstores not situated in territory served by any wholesaler. Midwest Distributors, Inc., and MacFadden Publications, Inc., do not sell to wholesalers or retailers but consign their magazines to them for sale. The other publishers sell outright. The Commission further found and concluded as follows:

"At all times hereinafter mentioned and for an undetermined period prior thereto it has been the custom of the industry and trade that all magazines remaining unsold in the hands of the wholesaler and retailer would be returned to the publishers from whom received and the wholesaler or retailer reimbursed or credited in the amount paid therefor, so that the publishers received payment only for those magazines actually sold by their wholesalers and retailers during the current period, that is from the time they were placed on sale until the succeeding issue of the same magazines were placed on sale. Also, it has been and is the custom that the wholesaler would reimburse or give credit to the retailer for all magazines remaining unsold in his hands at the end of the current period, so that the wholesaler receive payment only for those magazines which are sold by the retailer during the current period. Also, it is and has been the custom that instead of shipping back the entire unsold magazine, the cover only is returned, as a token that the same remains unsold, and wholesalers and retailers have been and are privileged to sell the remaining body of the magazine as waste paper, for their own account. The body of the magazine, from which the cover has been removed and for which the wholesaler or retailer has been reimbursed, is known in the industry and trade as a 'coverless' magazine or 'coverless return' or 'return.' "

"Paragraph Four: At all times hereinafter mentioned there were and now are throughout the United States, persons, firms and corporations hereinafter to be referred to as back-number distributors, engaged in the business of collecting non-current cast-a-way magazines, particularly story magazines, and selling them to retail dealers, consisting principally of news stands, drug stores and other retailers handling current magazines. These non-current magazines, hereinafter to be referred to as 'back-numbers', regularly retail at from one-third to one-fourth the sale price of the same magazine while current. The sources of supply of these back-number distributors were and are principally waste paper dealers located throughout the United States and, to a minor extent, such organizations as the Salvation Army, junk dealers, etc. The back-number magazines have been and are in active, substantial competition with the current numbers.

"Paragraph Five: Among the back-number distributors above referred to were Back Number Wilkins, Inc., a corporation, and Eastern Back Number Magazine Company located, respectively, at Danvers and at Lynn and East Saugus, Massachusetts. These two distributors at the times hereinafter mentioned dealt only in entire back-number magazines, as distinguished from coverless magazines or returns, and were the principal distributors of back-number magazines in eastern Massachusetts, and in the early part of the year 1932 had an aggregate of approximately 800 retail dealers in that area, 90% of whom were dealers in current magazines. The principal sources of supply of these two back-number distributors were waste paper concerns located in Massachusetts, New Hampshire, New York, Michigan, Pennsylvania, Ohio, Illinois and Missouri. When second-hand magazines were purchased by them from these sources of supply they were regularly shipped from said states to them at their respective places of business in Massachusetts.

"Paragraph Six: The retail dealers of the back-number distributors above named handled only entire, covered back-numbers and did not sell or offer for sale coverless magazines or returns.

"Paragraph Seven: In eastern Massachusetts the magazines of respondents were distributed by some thirteen wholesalers located in Boston and other towns and cities in that area. Respondents regularly sold and delivered current magazines from their respective places of business, located as aforesaid, to these wholesalers, who in turn supplied the retail dealers in that area,

including 90% of the retailers handling the magazines of the back number distributors hereinabove named.

"Paragraph Eight: On or about November 5, 1931, representatives of the respondents, at a meeting in the City of New York, formed the Special Committee on Magazine Distribution, consisting of a representative from each of the respondent companies, to take action for and on account of respondents. The formation of said Special Committee, and the action thereafter taken by it, was with the full knowledge and consent of the responsible executive officers of the respondent corporations. Thereafter and beginning on the first of April, 1932, and continuing until about August 15, of that year, the Special Committee dispatched letters to all of the wholesalers in eastern Massachusetts handling the magazines of the respondents demanding that they inform their retail deals(ers) that they, the retail dealers, would no longer be permitted to handle back-number magazines; that if they handled back-number magazines they would be denied further supplies of current issues. Upon receipt of these letters, the said wholesalers notified their retail dealers, both in writing and orally, that they would be required to choose between handling current issues and back-number magazines; that if they continued to handle back-number magazines they would no longer be supplied with current issues.

"Paragraph Nine: Because of the above-mentioned demands of respondents upon their wholesalers and of the notices of the wholesalers to their retailers approximately half the retail dealers handling both the current issues of respondents and the back-number magazines of the two distributors named, discontinued handling back-number magazines, and said distributors had difficulty in securing other dealers for the same reason.

"Paragraph Ten: During the same period of time the above-mentioned letters to wholesalers in eastern Massachusetts were being dispatched, the Special Committee on Magazine Distribution was also seeking to interfere with the sources of supply of the back-number distributors, by bringing pressure to bear upon the Salvation Army and other sources of supply to prevent the sale of back-number magazines to those concerns distributing the same to retail dealers.

"Paragraph Eleven: The result of the joint action of these respondents, as hereinabove found, has been and is to substantially interfere with and lessen competition between respondents and their wholesalers, on the other (sic) hand, and the said distributors of back-number magazines, on the other hand, thus depriving the public, to a substantial extent, of the benefits that would normally flow from such competition.

"Conclusion

"The acts and practices of these respondents under the circumstances hereinabove found and set forth, have been and are to the injury of their competitors and prejudicial to the public interest and constitute unfair methods of competition in commerce within the intent and meaning of Section 5 of the Act of Congress hereinabove entitled."

■ While it is contended that the Commission was without jurisdiction in that the unfair methods of competition found were not shown to have been used in interstate commerce, it seems too clear for controversy that they were. The new magazines whose source of supply was controlled by the publishers were largely shipped across state lines, and the threat to withhold them from dealers who did not sell new magazines exclusively would, if carried out, to that extent stop interstate transportation of the magazines. So, too, the secondhand magazines were largely transported from state to state, and the threatened curtailment of that business would have like effect upon interstate commerce.

■ Though any one publisher acting alone may sell or not sell his magazines as he may choose, Federal Trade Commission v. Raymond Bros.-Clark Co., 263 U.S. 565, 44 S.Ct. 162, 68 L.Ed. 448, 30 A.L.R. 1114, two or more may not combine in such refusal if the result is to harm the public or any person against whom the concerted action is taken, Binderup v. Pathe Exchange, 263 U.S. 291, 44 S.Ct. 96, 68 L. Ed. 308.

■■ While the Federal Trade Commission is not an agency for the enforcement of the Sherman Anti-Trust Act (15 U.S.C.A. §§ 1–7, 15 note), that act does require consideration in deciding what, in view of the public policy so declared, are unfair methods of competition which the Commission

526

is authorized to suppress. Federal Trade Commission v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882. And an unfair method of competition which is against public policy may be stopped by the Commission for that alone. Federal Trade Commission v. Klesner, 280 U.S. 19, 50 S.Ct. 1, 74 L.Ed. 138, 68 A.L.R. 838.

■ The Sherman Act is to be construed in the light of the circumstances attending each case by applying what is called the rule of reason in determining what concerted action unlawfully restrains trade or commerce among the several states. Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A. (N.S.) 834, Ann.Cas.1912D, 734; United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663; Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683, Ann.Cas.1918D, 1207; Standard Oil Co. v. United States, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926; Appalachian Coals v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825; Sugar Institute v. United States, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859.

■ The Federal Trade Commission Act was in part at least aimed at the elimination of methods of competition called unfair which if left untouched would probably create the evils prohibited by the Sherman Anti-Trust Act. Federal Trade Commission v. Raladam Co., 283 U.S. 643, 51 S.Ct. 587, 75 L.Ed. 1324, 79 A.L.R. 1191; Federal Trade Commission v. Sinclair Co., 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746. The Commission may, and should, issue its complaint and, if its essential allegations are proved, make its order to cease and desist whenever the methods of competition are unfair in interstate commerce, and their prevention is in the public interest, though it may not properly act to prevent those trade practices which merely are offensive to a suitable standard of business morality. Northam Warren Corp. v. Federal Trade Commission, 59 F.(2d) 196 (C.C.A.2).

■ But in this instance the concerted attempt was to prevent the sale of secondhand magazines where the new magazines of the petitioners were sold in competition with each other and the secondhand ones. It was shown that the business of selling secondhand magazines had been seriously curtailed by the agreement of the publish-

ers and the action taken thereunder; and, except for some unsupported argument that the public health was endangered by the sale of used magazines, the action was plainly for the purpose of stifling competition. Certainly it is self-evident that an owner of secondhand magazines may of right sell them if he chooses as may the owner of any other property suitable for sale. One need only remember the large use made of what are really secondhand books and magazines in the libraries throughout the country to put aside as inconsequential the notion that the business is injurious to public health. The requirement that dealers must not sell secondhand magazines where the new ones are sold as a condition precedent to being allowed to obtain new magazines for sale from the petitioners has been shown unreasonable and unnecessary to protect any legitimate rights of the publishers, and the order of the Commission under review should be affirmed, since the facts which support it have been found on sufficient evidence. Federal Trade Commission v. Winsted Hosiery Co., 258 U.S. 483, 42 S.Ct. 384, 66 L.Ed. 729; Federal Trade Commission v. Pacific States Paper Trade Association, 273 U.S. 52, 47 S.Ct. 255, 71 L.Ed. 534.

■ Another phase of the matter should be noticed, however. Much has been made in argument of a claim that the practice of accepting the return of covers only for credit or reimbursement has enabled unscrupulous dealers to sell as reading matter the coverless magazines for which they have paid nothing. Though the record does not lend much support to that claim, possibly because the petitioners saw fit to introduce no evidence themselves, it is plain enough that such a practice is possible and, if it is indulged in, that it is one which the publishers have the right to prevent by all fair means. Whether the means used are fair or not depends upon the necessities of each case. It is no answer to the publishers that they may prevent the wrong by refusing to accept covers for credit. That is a reasonable method for them to adopt if they want to in conducting their business, and they have the right to prevent the sale of the body of the magazines as reading matter whose covers they have taken, or agreed to take, back for credit or reimbursement. It is our understanding of the cease and desist order that it does not cover instances where the claimed abuse of selling coverless returns actually

exists and that the publishers are permitted to take concerted action to prevent the sale of their new magazines where coverless returns are sold. It may not be an unfair method of competition to take such action to prevent the sale of their new magazines where any coverless copies of them are sold, in view of the likelihood that most coverless magazines will be coverless returns. Under the order made the publishers may do whatever is reasonably necessary to that end, and that fully preserves their rights. We assume that the Commission will make its order more specific in this respect if cause therefor is shown.

Order affirmed.