## G. S. SUPPIGER CO. v. MORTON SALT CO.
### No. 7356.

Circuit Court of Appeals, Seventh Circuit.

Jan. 14, 1941.

Rehearing Denied March 11, 1941.

Robert H. Wendt, of Chicago, Ill., for appellant.

Clarence E. Mehlhope and Clarence F. Poole, both of Chicago, Ill., for appellee.

Before EVANS and KERNER, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

Plaintiff sued defendant for infringement of its patent No. 2,060,645, covering a "tablet depositing machine." Both validity and infringement of said patent were denied. After defendant had taken the deposition of two of plaintiff's officers, it moved for summary judgment, and its motion was granted, upon the ground that the testimony showed plaintiff was using its patent to secure a monopoly of a non-patented article, to-wit, salt tablets.

The District Court, taking its guidance from the holdings in American Lecithin Co. v. Warfield Co., 7 Cir., 105 F.2d 207, 212; Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371; Carbice Corp. v. American Patents Development Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819; Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852, found:

"2. Plaintiff and its predecessor, Scientific Tablet Company, now dissolved, since 1927 have been in the business of manufacturing and selling salt tablets of predetermined content for use in the canning industry in lieu of loose salt or brine. They also manufactured or had manufactured for them machines under the patent in suit and also other machines under patents owned by them for depositing salt tablets. They did not sell but leased said machines made under the patent in suit and their other patents to commercial canners of vegetables, as tomatoes, and the like, in the many states wherein such canners are located. The leases were in writing and included a license to use the patented machine, upon the condition and agreement by the lessee *that plaintiff's and its predecessor's salt tablets be used exclusively in said patented, leased machines.*

"3. Plaintiff's salt tablets have a particular configuration which is required for use in plaintiff's depositing machines for continuous, untroubled use. But plaintiff's salt tablets are not patented. And anyone may lawfully make and sell them.

"4. The manufacture and sale of the salt tablets is and was the main business of plaintiff's predecessor and of plaintiff after it acquired that business in June, 1928, and which it has since carried on as a subsidiary company. The end and aim of the business was and is the sale of the salt tablets in which its profits lie. The patented depositing machine of the patent in suit and of other patents is a mere secondary adjunct.

"5. The defendant is in the business of mining, processing and selling salt for commercial canning and for other purposes. It also makes and sells salt tablets such as those made and sold by plaintiff for use in the canning industry. It also makes and leases salt tablet depositing machines to canners, and in particular the salt depositing machines charged to infringe the patent in suit. Defendant's salt tablet depositing machine is not patented."

"7. There is no genuine issue as to any material fact involved in the case."

The Facts. Plaintiff is a canning company which owns and operates a wholly owned subsidiary devoted to making and

leasing a patented tablet depositing machine and to making and selling salt tablets of a particular design and configuration.

This last-named business is much smaller than plaintiff's main business, which is canning.

In addition to the principal use as a salt depositor, the machines have also been sold for "separating, picking up and depositing gelatine-enclosed lemon oil capsules."

Plaintiff and its predecessor pioneered in the salt tablet industry (placing salt of predetermined quantity in a definite amount of canned vegetables, through the use of salt tablets deposited by a machine) as applied to the canning industry and developed it to its present success.

Dismissal of its suit was due, not to the invalidity or non-infringement of its patent (which was not litigated) but to plaintiff's alleged efforts to monopolize the salt tablet business by inserting in its lease (paragraph 2) a provision that the licensee or lessee should use no salt tablets in said machine, not made by plaintiff.

Defendant also makes and licenses a tablet depositing machine. It·has continuously operated its business since 1927. Its machine is allegedly an infringement of plaintiff's patent. It also leases its machine to the trade and provides in its.lease that the lessee shall use only salt tablets made by it.

The summary decree dismissing plaintiff's suit was based on plaintiff's use of its patent to develop a monopoly of an unpatented article, to-wit, salt tablets.

The extent to which a patentee is prevented from enjoining the infringement of his patent, if he be also guilty of using it to develop a monopoly in an unpatented product, which is made by or used in the patented article, has been considered and defined in several cases. The four leading cases are cited above.

■ This court announced the test which should be applied, in American Lecithin Company v. Warfield, supra, in this language:

"Stated in another way, the underlying question in each case is directed to the inquiry as to whether the patentee's activities are within or beyond his domain. In determining when courts will interfere with the patentee's power to sue infringers (contributory or direct), it is necessary to take into consideration whether, as a practical matter, the exercise of the patent monopoly will result in a limited monopoly in an un-

patented commodity, and whether the patentee seeks to derive his profits not from the invention itself but from the unpatented supplies used in the invention."

Further discussion of the rule seems unnecessary.

Our task is to apply the rule to the facts of this case. Is plaintiff, through its patent license agreement, securing a monopoly (limited or complete) in the sale of an unpatented product, to-wit, salt?

■ A patentee, who is successful in such an effort, accomplishes about the same thing as he does when he fixes the price at which his licensees may resell a patented article. Such a practice has been judicially condemned. Carbice Corp. v. American Patents Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819; Bauer & Cie v. O'Donnell, 229 U.S. 1, 33 S.Ct. 616, 57 L.Ed. 1041, 50 L.R.A.,N.S., 1185, Ann.Cas.1915A, 150; Straus v. Victor Talking Mach. Co., 243 U.S. 490, 37 S.Ct. 412, 61 L.Ed. 866, L.R.A.1917E, 1196, Ann.Cas.1918A, 955; Boston Store v. American Graphophone Co., 246 U.S. 8, 38 S.Ct. 257, 62 L.Ed. 551, Ann.Cas.1918C, 447. For the same reason, a patentee's efforts to extend its legal monopoly to a monopoly in an unauthorized field, through license agreements, must meet with like judicial condemnation.

■ A patent, in itself, is a monopoly— a legal monopoly. The limits of that monopoly are prescribed (and fixed) by the statute. They are to make, to sell, and to use the patented product or process for a period of seventeen years. The patent grant does not, however, extend to control of the making, the selling, or the use of an unpatented article which may be the product of the patented·process or product, or which may be necessarily used by the licensee of the patented machine or product.

■ On the other hand, a patentee is not handicapped in his commercial transactions because he owns a patent. What he could lawfully do before he acquired the patent, he may lawfully do after acquirement. Neither the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, nor the Clayton Act, 38 Stat. 730, was intended to discriminate between patentees and others when it comes to use or sale of unpatented articles.

It is because a patentee has a leverage, a coercive argument, through the ownership of an important patent, the use of which he may grant or withhold from a customer, that his position becomes one fraught with

dangerous monopolistic possibilities. The temptation to use his legal patent monopoly so as to dominate a field beyond the legitimate coverage of his patent is great. For this reason the close scrutiny of patent license agreements is quite needful.

Section 3 of the Clayton Act, 15 U.S.C.A. § 14, upon which defendant-appellee particularly relies, makes unlawful the lease of machinery (either patented or unpatented) on condition that the lessee shall not use the supplies or other commodities of a competitor. However, unlawfulness is made to depend upon a provision which is here important,—where the effect of such lease or such condition may be substantially to lessen competition or tend to create a monopoly in any line of commerce.

Appellant's agreement falls within the condemnation of this statute if its leases substantially lessen competition or tend to create a monopoly. It is in respect to this last requirement that our attention must be focused. In short, does the condition in plaintiff's leases tend to create a monopoly or substantially to lessen competition?

A similar question was presented in Standard Oil Company v. United States, 283 U.S. 163, 51 S.Ct. 421, 425, 75 L.Ed. 926, where the restrictive agreements, tending substantially to lessen competition, were, however, very much greater than those appearing in the lease in question.

Addressing itself to the requirement of this condition, the court expressed itself at considerable length upon the necessity of proof to establish the fact that competition had been substantially lessened or that plaintiff had tended to create a monopoly. We quote therefrom:

"But an agreement for cross-licensing and division of royalties violates the Act only when used to effect a monopoly, or to fix prices, or to impose otherwise an unreasonable restraint upon interstate commerce. * * *

"In the case at bar, the primary defendants own competing patented processes for manufacturing an unpatented · product which is sold in interstate commerce; and agreements concerning such processes are likely to engender the evils to which the Sherman Act was directed. * * *

"We must, therefore, examine the evidence to ascertain the operation and effect of the challenged contracts."

Continuing, the Court said:

"No monopoly, or restriction of competition, in the business of licensing patented cracking processes resulted from the execution of these agreements. * * *

"Moreover, the record does not show that after the execution of the agreements there was a decrease of competition among them in licensing other refiners to use their respective processes.

"No monopoly, or restriction of competition, in the production of either ordinary or cracked gasoline has been proved. * * * Under these circumstances the primary defendants could not effectively control the supply or fix the price of cracked gasoline by virtue of their alleged monopoly of the cracking processes, unless they could control, through some means, the remainder of the total gasoline production from all sources.

"Proof of such control is lacking. * * *

"In the absence of proof that the primary defendants had such control of the entire industry as would make effective the alleged domination of a part, it is difficult to see how they could by agreeing upon royalties rates control either the price of the supply of gasoline, or otherwise restrain competition. * * *

"To warrant an injunction * * * there must be a definite factual showing of illegality."

The foregoing quotations are most applicable to the facts in the instant case. The decree before us was issued in a summary proceeding wherein the fact showing as to the extent of the influence of the agreement upon the salt business was almost nil.

In support of its contention that it was not substantially lessening competition or creating a monopoly in the salt business, plaintiff calls attention to the following facts:

(1) Plaintiff's machine is not the only machine used by the trade to deposit salt tablets of predetermined amount in the canning or other industries.

(2) Defendant makes a machine and uses it in the same way as plaintiff. It requires its purchaser or licensee to use salt tablets made by it.

(3) Plaintiff's lessees are permitted to purchase and use other machines. Its lessee may use, in connection with such other machines, any salt or salt tablets it desires. For the significance of this fact, see Federal Trade Commission v. Sinclair Refining Company, 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746.

(4) The volume of all the salt business is large. The amount used in the canning field is so small that its complete control would not result in a monopoly of the salt industry. It is not the salt tablet as such but the salt which goes into the salt tablet which must determine the monopolistic tendency of plaintiff's lease contracts. For comparison see the amount of cracked gas to all gasoline used in the Standard Oil case, with the percentage of salt used in canning to all salt used for all purposes.

(5) Plaintiff stresses the fact that its machine may be used by its licensee for purposes other than depositing salt.

(6) Plaintiff's machines call for a $30 annual rental. The two hundred machines it has leased each cost $300 to build, from which fact it argues that the making of the machine for rental purposes—a 10% return—can not be called a sham or a coverage to monopolize the sale of an unpatented product, salt.

Due to the District Court's entry of its decree in a summary proceeding, we are not able to determine the monopolistic extent of plaintiff's contract. The court was clearly in error in granting this summary judgment without an inquiry into the facts. Unless the defendant can make "a definite factual showing of illegality" arising from plaintiff's agreement with its licensee, it is not entitled to judgment of dismissal The presence of such a factual issue, ordinarily, is a bar to the granting of a summary judgment.

The decree is reversed.