TAMPA ELECTRIC COMPANY,
Plaintiff,

v.

NASHVILLE COAL COMPANY et al.,
Defendants.

Civ. A. No. 2418.

United States District Court
M. D. Tennessee,
Nashville Division.

Nov. 18, 1958.

David Keeble, of Hooker, Keeble, Dotson & Harris, Nashville, Tenn., William C. Chanler, of Winthrop, Stimson, Putnam & Roberts, New York City, for plaintiff.

Cecil Sims, of Bass, Berry & Sims, Nashville, Tenn., Abe Fortas and Norman Diamond, of Arnold, Fortas & Porter, Washington, D. C., for defendants.

WILLIAM E. MILLER, District Judge.

This is an action for a declaratory judgment seeking to establish that a certain contract referred to as the Potter-Tampa contract is valid and enforceable and binding upon both the plaintiff and the defendants.

The defendants, hereinafter sometimes referred to as the Seller, have moved the Court for summary judgment, contending that there are no issues of fact to be decided by the Court, and that the undisputed facts establish the illegality of the contract under Section 3 of the Clayton Act, 15 U.S.C.A. § 14 and Sections 1 and 2 of the Sherman Act, 15 U.S.C.A.

§§ 1, 2. The plaintiff, Tampa Electric Company, hereinafter sometimes referred to as the Buyer, has also moved for summary judgment, insisting that the Potter-Tampa contract upon the basis of the undisputed facts is valid and enforceable. The Buyer is a large electric utility company serving Tampa, Florida, and its metropolitan area. Prior to the Potter-Tampa contract, oil was the only fuel used by the Buyer in its production of electric power. It is at present constructing a new plant or station near Tampa, known as the Gannon Station, which will eventually contain six separate power-producing units. Two of these units have been completed and are using coal as fuel, and a third coal-burning unit is under construction.

The contract in issue was made May 23, 1955, between the Tampa Electric Company and Justin Potter and David K. Wilson, co-partners doing business as the Potter Towing Company. After a series of transfers Nashville Coal Company, Inc., a wholly owned subsidiary of West Kentucky Coal Company, succeeded to the Potter-Wilson position under the contract. The West Kentucky Coal Company then made an agreement with Potter and Wilson to indemnify them against any loss resulting from nonperformance of the Potter-Tampa contract. After all transfers of the contract had been completed the Seller refused to perform on the ground that it was in violation of the Clayton and Sherman Acts, and subsequently the Buyer filed this action for declaratory judgment.

The terms of the Potter-Tampa contract are substantially as follows: The Seller agrees to provide the Buyer and the Buyer agrees to purchase from the Seller all the coal required as fuel for the production of electric energy at the Gannon Station for a period of 20 years. The first two units of the plant now in operation will use coal as fuel, and as to these units "the full requirements shall not be less than 225,000 tons of coal per unit per year". It is agreed that a third unit now under construction will also use coal, and that all future units constructed

will be supplied by the Seller if the Buyer elects to use coal as fuel. It is further stipulated that two years' notice will be given the Seller as to whether or not coal will be used in future units. The contract price is fixed at a minimum of $6.85, less a minimum rebate of 45 cents per ton for the first eighteen months and 30 cents per ton thereafter. There is no provision in the contract as to other plants now in operation or plants which might be constructed in the future, the contract applying only to the Gannon Station.

It is estimated by the Buyer that within a very few years the Gannon Station will consume more coal than is presently consumed in the entire State of Florida. Peninsular Florida's present coal consumption is approximately 700,000 tons per year as compared to the 450,000 tons required by the Potter-Tampa contract as a minimum for the first two units at the Gannon Station. The Buyer is presently purchasing coal for the first two units from Love and Amos Coal Company under a contract which is subject to cancellation on twelve months' notice by the Buyer, or subject to immediate cancellation should the Seller begin to perform under the Potter-Tampa contract.

It is the contention of the Seller that the Potter-Tampa contract is invalid under Section 3 of the Clayton Act in that it is an agreement or understanding not to purchase the product of the Seller's competitors and as such its effect is to substantially lessen competition. The relevant provisions of Section 3 are as follows:

"It shall be unlawful for any persons engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States * * * on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods * * * of a competitor or competitors of the * * * seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

To sustain the validity of the contract the Buyer insists, first, that the Potter-Tampa contract does not fall within the scope of Section 3 in that it does not have the effect of requiring that the purchaser shall not use the goods of a competitor of the Seller. In support of this argument it is pointed out that the Buyer, consistently with the Potter-Tampa contract, may use oil as a fuel in the remaining three units at the Gannon Station, and that it may use the coal of a competitor of the Seller in any future plant to be constructed and in any present oil-burning plant converted to the use of coal. However, in the present case the Court is persuaded that the Potter-Tampa contract is a requirements contract having the effect of requiring the Buyer not to use the goods of a competitor of the Seller within the intent and meaning of Section 3. It clearly provides, in effect, that the Buyer must buy only from the Seller all of its coal for the two units now in operation and for the additional unit now under construction at the Gannon Station, representing in fact all of the Buyer's present coal requirements. According to the Buyer's estimation, it will require 1,000,000 tons of coal per year at the Gannon Station by 1961. A contract to supply the total coal requirements of an operation of such magnitude for such a protracted exclusionary period clearly falls within the purview of the statute. The question must be decided upon the basis of realities and the contract construed reasonably in the light of existing facts. It is true that coal could conceivably be used in future plants or by converting existing plants, but there is no evidence that this is presently planned. While the possibilities suggested do exist the unalterable fact remains that the contract at issue is one which "pre-

empts" or "engrosses" all of the known coal requirements of the Buyer—manifestly a large and substantial volume of commerce—for a period of 20 years.

This conclusion as to the effect of the contract under the Clayton Act is supported by the decision of the Supreme Court in International Salt Co., Inc. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20, in which the International Salt Company required tying arrangements wherein the lessees of its patented machines could use only salt purchased from the lessor. In the year 1944 the company sold approximately 119,000 tons of salt for about $500,000 for use in its leased machines. The tying clause in practically all of its leases required the lessee to purchase from the lessor all unpatented salt and salt tablets consumed in the leased machines. The Government moved for summary judgment which was sustained by the trial court. On appeal the International Salt Company insisted that summary judgment was unauthorized because it precluded trial of alleged issues of fact as to whether the restraint was unreasonable within the Sherman Act or substantially lessened competition or tended to create a monopoly in salt within the Clayton Act. In rejecting this argument and in holding that the tying agreements were illegal the Court stated:

"We think the admitted facts left no genuine issue. Not only is price-fixing unreasonable, per se, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, but also it is unreasonable, per se, to foreclose competitors from any substantial market. Fashion Originators Guild v. Federal Trade Commission, 2 Cir., 114 F.2d 80, affirmed, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949. The volume of business affected by these contracts cannot be said to be insignificant or insubstantial and the tendency of the arrangement to accomplishment of monopoly seems obvious. Under the law, agreements are forbidden which 'tend to create a monoply,' and it is immaterial that the tendency is a creeping one rather than one that proceeds at full gallop; nor does the law await arrival at the goal before condemning the direction of the movement." 332 U.S. at page 396, 68 S.Ct. at page 15.

It was regarded as immaterial by the Court that the leases provided that if competitors offered salt of an equal grade at a lower price the lessee should be free to buy in the open market unless the lessor would furnish the salt at an equal price, and further that the lessee was entitled to any benefit of any general price reduction in the lessor's salt tablets. It was found that these provisions, while affording some measure of protection to the lessee, did not avoid "the stifling effect of the agreement on competition". Thus the decision would appear to stand for the proposition that a violation of Section 3 occurs if a substantial amount of business is removed from the area of competition even though there remains the possibility of use of a competitor's product.

Other decisions are to the same effect, i. e., that the possibility that a buyer might use a competitor's product does not exempt exclusive contractual arrangements from the condemnation of the Clayton Act. Judson L. Thomson Mfg. Co. v. Federal Trade Commission, 1 Cir., 150 F.2d 952, certiorari denied, 326 U.S. 776, 66 S.Ct. 267, 90 L.Ed. 469; Signode Steel Strapping Co. v. Federal Trade Commission, 4 Cir., 132 F.2d 48. The case of Federal Trade Commission v. Sinclair Refining Co., 261 U.S. 463, 43 S.Ct. 450, 453, 67 L.Ed. 746, relied on by the Buyer, is deemed to be distinguishable because the lease involved left the buyer "free to buy wherever he chooses", or "to discontinue any or all" dealings with the Seller, whereas in the present case the Buyer is committed for a period of 20 years to purchase from one Seller alone all coal consumed at one of its major plants.

The undisputed facts establish that the Gannon Plant's coal requirements will soon exceed in fuel equivalent all of the oil burned at the Buyer's other two plants. It is estimated that after 1961 the Buyer's coal requirements will increase as required to about 2,250,000 tons per year. Under the terms of the Potter-Tampa contract the Seller, alone, would have the opportunity to furnish this large amount of coal to the Buyer.

■ The Buyer's argument that the Potter-Tampa contract is not a requirements contract because coal competes with other fuel is not only contrary to the express language of Section 3, but it is also untenable when the decisions construing Section 3 are considered. It is true that oil is the fuel used in all plants operated by the Buyer other than the Gannon Station, and that oil could be used in the last three units to be built at the Gannon Station. But this fact becomes immaterial in view of the express language of Section 3 that an exclusionary agreement is unlawful where its effect may be to substantially lessen competition "in any line of commerce".

Although both oil and coal are fuels, each is a separate and distinct line of commerce. Thus it was held in George Van Camp & Sons Co. v. American Can Company, 278 U.S. 245, 253, 49 S.Ct. 112, 113, 73 L.Ed. 311, with reference to another section of the Clayton Act using identical language:

"The phrase is comprehensive and means that if the forbidden effect or tendency is produced in one out of all the various lines of commerce, the words 'in any line of commerce' literally are satisfied."

And in United States v. E. I. Du Pont De Nemours & Co., 353 U.S. 586, 593, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057, the Supreme Court in ruling that automotive finishes and fabrics were a separate line of commerce from other similar materials, stated:

"* * * automotive finishes and fabrics have sufficient peculiar characteristics and uses to constitute them products sufficiently distinct from all other finishes and fabrics to make them a 'line of commerce' within the meaning of the Clayton Act."

■ The Buyer further argues that the Potter-Tampa contract not only did not stifle or lessen competition but actually stimulated or increased it by introducing coal to Peninsular Florida and breaking the oil monopoly. It is pointed out that on the basis of the most recent figures at the time the contract was entered into coal accounted for less than 6 per cent of the fuel consumed in the entire state of Florida, and that every power-generating unit in Peninsular Florida burned oil in its boilers. It is said that discounting the Panhandle of Florida where all of the natural gas is consumed Peninsular Florida has been monopolized by oil. It is further argued that until coal was first burned in the units at Gannon Station a year ago there was virtually no challenge to oil's strangehold in Peninsular Florida, and that this contract, therefore, created competition where none had existed before. Conceding that coal is a newcomer to the Florida market and that its use by the Tampa Electric Company might stimulate the market and induce other consumers to convert to coal, the Court is of the opinion that this possibility does not save the contract in issue from illegality under Section 3 of the Clayton Act. Inquiries of this kind were expressly rejected as irrelevant in Standard Oil Company of California, and Standard Stations v. United States, 337 U. S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371. In that case the Standard Oil Company had made numerous contracts with independent dealers to supply their full requirements for certain "Standard" products for a period of six months. There was no evidence that competition had actually decreased, but the Court held that Section 3 of the Clayton Act did not require such proof in order to establish a violation of its terms. In this connection it was stated:

"* * * To interpret that section as requiring proof that competition

has actually diminished would make its very explicitness a means of conferring immunity upon the practices which it singles out \* \* \*". 337 U.S. at page 311, 69 S.Ct. at page 1060.

The Court then concluded:

"We conclude, therefore, that the qualifying clause of § 3 is satisfied by proof that competition has been foreclosed in a substantial share of the line of commerce affected. It cannot be gainsaid that observance by a dealer of his requirements contract with Standard does effectively foreclose whatever opportunity there might be for competing suppliers to attract his patronage, and it is clear that the affected proportion of retail sales of petroleum products is substantial. In view of the widespread adoption of such contracts by Standard's competitors and the availability of alternative ways of obtaining an assured market, evidence that competitive activity has not actually declined is inconclusive. Standard's use of the contracts creates just such a potential clog on competition as it was the purpose of § 3 to remove wherever, were it to become actual, it would impede a substantial amount of competitive activity." 337 U.S. at page 314, 69 S.Ct. at page 1062.

A similar situation exists in the present case, there being no direct evidence that competition would actually decrease as a result of performance of the contract. It is conceivable that competition might increase due to the introduction of a product into a comparatively new market. But the inescapable fact persists that the Potter-Tampa contract for a period of 20 years excludes competitors of the Seller from a substantial amount of trade, although as the plaintiff asserts, the Seller was only one of 700 coal producers who could serve the same market. The contract is exclusionary to such a degree and the volume of commerce affected is manifestly so large that there is no escape from the conclusion that its

effect under the circumstances disclosed is to "probably lessen competition, or create an actual tendency to monopoly", to use the words of the Supreme Court in Standard Fashion Company v. Magrane-Houston Co., 258 U.S. 346, 357, 42 S.Ct. 360, 362, 66 L.Ed. 653, language re-approved in Standard Oil Company of California and Standard Stations v. United States, supra.

One reason for rejecting the argument in Standard Oil that actual lessening of competition must be shown was the difficulty which the courts would encounter in adopting a proper standard of proof for such cases. It was observed that "to require firm prediction of an increase of competition as a probable result of ordering the abandonment of the practice, would be a standard of proof if not virtually impossible to meet, at least most ill-suited for ascertainment by courts." [337 U.S. 293, 69 S.Ct. 1060.]

It is vigorously argued by the plaintiff that the Clayton Act does not apply to a requirements contract when the seller does not occupy a sufficiently powerful position in the market to enable him to assert "leverage" over the buyer. This argument is stated in the plaintiff's brief as follows:

"Even assuming that the contract at issue required plaintiff to purchase all of its fuel requirements from the defendants for a period of twenty years there is nothing in the anti-trust laws themselves nor in any case construing them which would outlaw the contract. It is abundantly clear from an examination of the legislative history of Section 3 of the Clayton Act as well as the cases applying that section to so-called 'requirements contracts', that the sole evil sought to be prohibited was a practice, very prevalent when the Clayton Act was adopted in 1914, whereby a seller who, by means of the economic leverage arising from a patent or from substantial economic control of a unique and desirable article, tied up a substantial portion of the retail or manufacturing mar-

ket by requiring retail dealers or manufacturers who wished to deal in his particular goods or utilize his patent to agree not to deal in the goods of a competitor. Clearly the contract here in issue bears no resemblance whatever to such agreements."

But here also it would appear that the plaintiff's argument is repelled by the decision in Standard Oil Company of California, and Standard Stations, supra. In referring to market dominance the court in that case held that the requirements contracts violated Section 3, even though:

"* * * Standard's share of the retail market for gasoline, even including sales through company-owned stations, is hardly large enough to conclude as a matter of law that it occupies a dominant position, nor did the trial court so find * * *". 337 U.S. at page 302, 69 S.Ct. at page 1056.

Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277, held that both proof of dominance in the market for the tying product and a showing that an appreciable volume of business in the tied product is restrained are essential conditions to judicial condemnation of a tying clause as a per se violation of the Sherman Act. But in the same case the court made it clear in its opinion that under the narrower standards of Section 3 of the Clayton Act either proof of market dominance or proof of restraint of a substantial volume of commerce would suffice to establish a violation. Thus, the court stated:

"From the 'tying' cases a perceptible pattern of illegality emerges: When the seller enjoys a monopolistic position in the market for the 'tying' product, or if a substantial volume of commerce in the 'tied' product is restrained, a tying arrangement violates the narrower standards expressed in § 3 of the Clayton Act because from either factor the requisite potential lessening

of competition is inferred." 345 U. S. at page 608, 73 S.Ct. at page 880.

The same distinction between the Sherman Act and the more limited and particularized provisions of the Clayton Act is to be borne in mind in considering Northern Pacific Railway Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545. The language of the court with respect to monopoly power or market dominance or control is limited to the facts of the case before the Court involving a tying agreement which was alleged to constitute an unreasonable restraint of trade under the general provisions of Section 1 of the Sherman Act. A Section 3 Clayton Act violation was neither claimed nor considered.

The wording of the statute itself lends no support to the argument that economic leverage or market dominance is a prerequisite to its violation and for this reason the effort to rely upon the legislative history of the Clayton Act would appear to be futile. The Court is of the opinion that the rationale of the court in Standard Fashion Company v. Magrane-Houston Co., supra, is applicable. In that case the court, in speaking of the legislative history of the Clayton Act, stated:

"Much is said in the briefs concerning the reports of committees concerned with the enactment of this legislation, but the words of the act are plain and their meaning is apparent, without the necessity of resorting to the extraneous statements and often unsatisfactory aid of such reports." 258 U.S. at page 356, 42 S.Ct. at page 362.

■ Nor is there any merit in the plaintiff's contention that the Clayton Act applies only to instances where numerous contracts with various dealers are involved and not to a case of a single seller and a single buyer. This position is not sustained by authority and no support can be found for it in the language or the purpose of the statute. Both language and purpose would be ignored if multiple buyers or sellers were held to be necessary to its violation.

The final contention of the plaintiff that Section 3 should not be applied where the buyer desires that the contract be performed is also without substance. The illegality of the contract under Section 3 renders it unenforceable at the suit of either party. In National Transformer Corp. v. France Mfg. Co., 6 Cir., 215 F.2d 343, 361, the court said:

"It may be here emphasized that a contract which cannot be performed without violation of a statute is illegal and void. Where parties are in pari delicto, the law will leave them where it finds them, and all relief is refused because of the public interest * * *. The defendant may assert the invalidity of an agreement, even though he is a participator in the wrong * * *. The defense of illegality is allowed, not as a protection to the defendant, but as a disability to the plaintiff."

It may be conceded that there are doubtless economic benefits inherent in the use of a requirements contract of this type, and that it seems somewhat harsh to invalidate such a contract, particularly when entered into by the parties of their own free will, in the evident belief that it was mutually advantageous, and without compulsion or constraint. But the Court's function is not to determine whether the contract is advantageous or desirable from the standpoint of the parties or of the public but whether it is legal. Under the circumstances of this record the two essential conditions are shown to invalidate the contract under Section 3 of the Clayton Act regardless of its merits or beneficial effects otherwise: First, the contract within the sense and meaning of Section 3 is one requiring the buyer not to use or deal in the goods of a competitor of the seller; and Second, the effect of the contract is to substantially lessen competition in a line of commerce. Since the Court is of the view that the contract is so condemned, its status under the Sherman Act need not be determined.

As the material facts shown by the pleadings, affidavits, and other pertinent papers, are not in dispute and no genuine issue of fact is involved, it follows that the defendants' motion for a summary judgment should be sustained and the plaintiff's similar motion overruled.

An appropriate form of judgment will be passed to the Court to implement this opinion declaring the rights of the parties accordingly.