### GLASS v. HOBLITZELLE et al.

#### No. 11961.

Court of Civil Appeals of Texas. Dallas.
April 6, 1935.

Rehearing Denied June 1, 1935.

Pat S. Russell, of Dallas, for appellant.

John R. Moroney, Thompson, Knight, Baker & Harris, and George S. Wright, all of Dallas, for appellees.

LOONEY, Justice.

This appeal is from an interlocutory order refusing a temporary injunction. R. Z. Glass, appellant, owner and operator of two second or subsequent run motion picture theaters in the city of Dallas, brought this suit for himself and others similarly situated, against appellees, owners and operators of class A theaters in Dallas, exhibiting first-run motion pictures.

Appellant alleged in substance that, since about June 1, 1934, he (and others similarly situated) had not been able to obtain from producers and distributors motion picture films with the privilege of exhibiting same in his theater at admission prices fixed by himself; that this interference with his right to manage his business in his own way was due to an unlawful agreement and conspiracy, between appellees and the major producing and distributing companies, originating as follows: That appellees threatened said major producing and distributing companies to discontinue taking their motion picture films for exhibition unless the latter in their contracts with the owners and operators of second-run theaters, including appellant, would obligate them to charge an admission price of at least 25 cents for all pictures for which appellees charge on first run an admission of at least 40 cents, and forbidding the exhibition of such pictures within 75 days after their first exhibition by appellees; that such an arrangement was consummated by appellees and said major producers and distributors, by reason of which appellant, and others similarly situated, have been unable to obtain from said producers and distributors picture films for exhibition, without first agreeing to said stipulations with reference to the admission fee and time of exhibition; that such arrangement constitutes and is a conspiracy violative of the anti-trust laws of the state; wherefore, appellant prayed for injunctive relief, temporary and permanent, enjoining appellees and each of them from continuing in force such agreements.

Appellees, answering, contended that the contracts with the distributors, under which they were licensed to exhibit motion pictures, being interstate in character, and simply the licensing of copyrighted motion picture films, the anti-trust statutes of the state of Texas were not applicable and that no conspiracy, in law or in fact, existed; that appellant failed to show such probable damage justifying the issuance either of a temporary or permanent injunction, and that the provisions of the National Industrial Recovery Act (48 Stat. 195), as applicable to the motion picture industry, furnished and furnishes appellant a complete remedy for redress of his grievances, if any, which remedy he failed to pursue.

After an exhaustive hearing, the trial court refused appellant's prayer for the temporary writ, and filed findings of fact and conclusions of law that, in our opinion, are fully sustained and are adopted as the holdings of this court on the issues presented. They are as follows: "1. That the contracts made by the several defendants with the distributing companies are made in reference to interstate commerce, and that the anti-trust laws of Texas have no application to such contracts or any alleged conspiracy in reference to the making of said contracts. 2. That the contracts complained of in plaintiff's petition show on their face that they were made for the licensing of copyrighted motion picture films, and the anti-trust laws of the State of Texas have no application to such contracts for the licensing of copyrighted motion picture films. 3. That it appears from the evidence that there was no conspiracy as alleged in plaintiff's petition. 4. That the plaintiffs have not shown such probable damage as would justify injunctive relief. 5. That the National Recovery Act for the motion picture

industry furnishes a remedy to the plaintiffs."

■ Ordinarily, on appeals of this nature, the only question to be considered is whether the trial court abused its discretion in making the interlocutory order appealed from. This general rule was announced in Harding v. W. L. Pierson & Co. (Tex. Com. App.) 48 S.W.(2d) 964, 966, as follows: "The rule is also well established in this state that the granting or refusing of a temporary injunction is within the sound discretion of the district court, and that the court's action will not be disturbed on appeal, unless it clearly appears from the record that there has been an abuse of such discretion." However, as the case has been fully developed, and thoroughly and ably briefed by both sides, we are constrained to discuss at some length the questions presented.

■ The combined effect of a number of assignments urged by appellant is that the court erred in holding the agreements between appellees and the distributors, interstate in character, hence not amenable to the anti-trust statutes of this state (Vernon's Ann. Civ. St. art. 7426 et seq.). This holding is assailed on the ground that said agreements bear no direct relation to the use or exhibition of motion pictures by appellees, under their exhibition contracts, and even if said contracts originally were interstate in character, that the same was lost when the distributors shipped the picture films to their respective agencies in Texas, to be there serviced and supplied, successively, to appellees and other exhibitors operating under similar contracts.

The counter contention of appellee is that where the owner of a motion picture theater signs in Texas an application to a distributor outside the state of Texas for a license to exhibit a moving picture film, and the application is accepted outside the state and the picture film is shipped to the local representative of the distributor in the state and supplied by him to the exhibitor under the license contract and after being exhibited is returned to said representative, and then is supplied to other exhibitors under contracts similarly made, that the transaction is interstate in character, and the Texas anti-trust laws have no application thereto, or to any alleged conspiracy incident to the making of such contract.

Each of the contracts between the distributor and exhibitor was made and carried out substantially in the following manner: The exhibitor would sign in Dallas, Tex., an application for a license contract of a copyrighted motion picture film; the contract attached to the application provided that it should not become effective until accepted at the home office of the respective distributor, either in New York or some other place outside the state of Texas. After being signed in Texas, the application was forwarded to the home office of the respective distributor outside the state, where it was accepted or rejected. If accepted, it became a contract for the licensing of a copyrighted motion picture film for a certain period of time, giving the exhibitor merely the right to exhibit the picture during such time and obligating him to return the picture to the distributor. After the acceptance of the contract, the distributor would ship the picture films described in the contract to its local representative in Texas for delivery to the exhibitor having the license contract, who, after exhibiting same for the required time, would return it to said local representative of the distributor, who would then supply the film to other exhibitors having similar contracts.

As above shown, the trial court found that these contracts were interstate in character, and that the anti-trust laws of Texas had no application thereto. In Binderup v. Pathe Exchange, reported in 263 U. S. 291, 44 S. Ct. 96, 99, 68 L. Ed. 308, with reference to a similar contention as to the nature of the contracts there involved, the court said: "The film contracts were between residents of different states, and contemplated the leasing by one to the other of a commodity manufactured in one state and transported and to be transported to and used in another. The business of the distributors of which the arrangement with the exhibitor here was an instance, was clearly interstate. It consisted of manufacturing the commodity in one state, finding customers for it in other states, making contracts of lease with them, and transporting the commodity leased from the state of manufacture into the states of the lessees. If the commodity were consigned directly to the lessees, the interstate character of the commerce throughout would not be disputed. Does the circumstance that in the course of the process the commodity is consigned to a local agency of the distributors, to be by that agency held until delivery to the lessee in the same state, put an end to the interstate character of the transaction and transform it into one purely intrastate? We think not. The intermediate delivery to the agency did not end,

and was not intended to end the movement of the commodity. It was merely halted as a convenient step in the process of getting it to its final destination. The general rule is that where transportation has acquired an interstate character 'it continues at least until the load reaches the point where the parties originally intended that the movement should finally end.' * * * Interstate commerce includes the interstate purchase, sale, lease, and exchange of commodities and any combination or conspiracy which unreasonably restrains such purchase, sale, lease or exchange is within the terms of the Anti Trust Act, denouncing as illegal every contract, combination, or conspiracy 'in restraint of trade or commerce among the several states.' * * * The contracts with these distributors contemplated and provided for transactions in interstate commerce. The business which was done under them— leasing, transportation, and delivery of films —was interstate commerce."

In a similar case, that of Alexander Film Co. v. Lazeres & Morfesy, 7 S.W.(2d) 599, 600, the El Paso Court of Civil Appeals said: "We have concluded that the transaction, evidenced by the contract and the facts found, was one in interstate commerce. That view is sustained, we think, by the following authorities: Real Silk Hosiery Mills v. City of Portland, 268 U. S. 325, 45 S. Ct. 525, 69 L. Ed. 982; F. L. Shaw Co. v. Dalton Adding Machine Co. (Tex. Civ. App.) 211 S. W. 833; Southern Discount Co. v. Rose (Tex. Com. App.) 296 S. W. [482] 483; Miller v. Goodman, 91 Tex. 41, 40 S. W. 718; Falls Rubber Co. v. LaFon (Tex. Com. App.) 256 S. W. 577; Southwest Gen. Elec. Co. v. Nunn Elec. Co. (Tex. Com. App.) 283 S. W. 781; Wilson v. Peace, 38 Tex. Civ. App. 234, 85 S. W. 31; Binderup v. Pathe Exchange, 263 U. S. 291, 44 S. Ct. 96, 68 L. Ed. 308." Also see New Cent. Mfg. Co. v. Scheurer (Tex. Civ. App.) 30 S.W.(2d) 388; Cole Motor Car Co. v. Hurst (C. C. A.) 228 F. 280.

We find no conflict between the cases above cited, and that of Ligon v. Alexander Film Co. (Tex. Com. App.) 55 S. W.(2d) 1030, 1031, relied on by appellant; in fact, in its last analysis, the Ligon Case is in harmony with the cases just cited. Among other things, the court said: "It may be granted without further ado, that had the transaction between the company and Ligon contemplated the doing of nothing by the company except to manufacture the films according to contract require-

ments and to ship them to the theaters at Lubbock, for the use and benefit of Ligon, the transaction would have been one of interstate commerce exclusively. It is perfectly plain, however, that the contract between the Film company and Ligon contemplated, as the main object of the company's entire undertaking, the public exhibition of the films in the theaters at Lubbock. The matter of publicly exhibiting the films was essentially intrastate business. Mutual Film Corp. v. Industrial Commission, 236 U. S. 230, 35 S. Ct. 387, 59 L. Ed. 552, Ann. Cas. 1916C, 296; Mutual Film Corp. v. Hodges, 236 U. S. 248, 35 S. Ct. 393, 59 L. Ed. 561. There was no inherent and intrinsic relation between the undertaking of the company to manufacture the films, and to ship them to Lubbock, and the company's undertaking to publicly exhibit the films in the theaters at Lubbock. The matter of manufacturing and shipping the films was but incidental to the accomplishment of the essential purpose of the contract; namely, the advertising at Lubbock, the business of Ligon, by the use of the films. The circumstance that interstate commerce was involved in the manufacture and shipment of the films does not alter the intrastate character of the public exhibition of the advertising matter contained in the films. The situation is controlled by the same principle as were the cases of Browning v. Waycross, 233 U. S. 16, 34 S. Ct. 578, 58 L. Ed. 828; General Ry. Signal Co. v. Virginia, 246 U. S. 500, 38 S. Ct. 360, 62 L. Ed. 854. That principle is explained and distinguished in York Mfg. Co. v. Colley, 247 U. S. 21, 38 S. Ct. 430, 62 L. Ed. 963, 11 A. L. R. 611."

We cannot accept appellant's view that the phase of the contract between distributor and exhibitor, brought under review, should be segregated from the rest of the contract, because in our opinion it constituted a material consideration. The record discloses that rentals paid by class A or first-run theaters, for the use of picture films, were exceedingly high, ranging from $2,500 to $9,000 per week, that it cost around $600 per week for advertising, besides taxes and the expense of maintenance and operation, whereas second or subsequent run theaters obtained these same pictures at a rental of about $20 per week, and their expense for advertising was relatively small. Appellant conceded that he would reap a material benefit from the advertisement given a picture by class A

theaters that was subsequently exhibited by him.

Mr. Hoblitzelle, a theater man of extended experience, expressed the opinion that the stipulations in question were reasonable and necessary for the protection of the large investments of class A theaters, without which they would not be able to rent and exhibit the best pictures. This witness was questioned and answered as follows:

"Q. What is your experience in the business as to what would be the effect on first-run picture houses, such as the Majestic and Palace in Dallas, charging 40 cents admission price, if the policy of subsequent run theatres charged less than 25 cents on feature pictures, would have eventually? A. I think it would eventually destroy it.

"Q. How? A. Well, I think the people, the public, would become price conscious and if they could see that same entertainment for one-half or one-third or, in many instances, one-fourth of the price that they would have to pay if they go downtown, they would not go downtown to see the picture, but wait for it to get to the second-run house."

Appellant conceded the necessity for such protection, and that it should exist in some fair way.

It is doubtless true that the feature of the contract objected to by appellant, if segregated and considered to itself would be intrastate in character, but in our opinion this cannot be done, rather the contract between distributor and exhibitor must be given a meaning broad enough to include, as constituent elements, these stipulations as to time and admission price for subsequent exhibitions, and as such they take on the character of the contract of which they are material parts.

The case of Dozier v. Alabama, 218 U. S. 124, 30 S. Ct. 649, 650, 54 L. Ed. 965, 28 L. R. A. (N. S.) 264, involved a statute of Alabama that imposed a license tax, on persons not having a permanent place of business in the state, who solicited orders for the enlargement of photographs and the sale of picture frames. The Chicago Crayon Company of Chicago, Ill., solicited such orders without paying this tax, including an option to purchase the frame in which the portrait was to be placed. The portraits and frames were transported to the agent of the company in Alabama, who made deliveries and collections. The agent was tried and fined for violating this statute. The Supreme Court of Alabama (154 Ala. 83, 46 So. 9, 129 Am. St. Rep. 51) conceded that the dealings as to the portraits were interstate commerce, but sustained the conviction on the ground that sales of the frames were consummated wholly in the state of Alabama. The Supreme Court of the United States reversed the Alabama court, on the ground that the attempt to apply the statute was in violation of the commerce laws of the Federal Constitution. Among other things, the court said: "No doubt it is true that the customer was not bound to take the frame unless he saw fit, and that the sale of it took place wholly within the state of Alabama, if a sale was made. But, as was hinted in Rearick v. Pennsylvania, 203 U. S. 507, 512, 27 S. Ct. 159, 51 L. Ed. 295, 297, what is commerce among the states is a question depending upon broader considerations than the existence of a technically binding contract, or the time and place where the title passed." Thus, the court held, in effect, that while the executory contract for the sale of the picture frame, considered to itself, was intrastate in nature, yet as it formed an integral part of an interstate transaction, that it became interstate in character.

Neither can we agree that the interstate character of the transaction was changed by the shipment of the picture films to an agent in this state, to be serviced and delivered to exhibitors in the order in which the picture had been booked under similar contracts. Mr. Cooke, in his work on the Commerce Clause of the Federal Constitution (article 1, § 8, cl. 3), discussing this phase of the subject, in section 75 said: "Nor does it ordinarily make any difference that transportation is not directly from the seller to the buyer; thus, it may be directly from the seller to his agent in the State, and thereafter from the agent to the buyer. Nor does it make any difference, as commonly happens, for convenience sake, the articles are transferred 'in bulk' to the agent, who thereafter 'breaks' the bulk and makes distribution of the articles therein contained to the respective buyers." To the same effect, see the Caldwell Case (Caldwell v. State of North Carolina), 187 U. S. 622, 23 S. Ct. 229, 47 L. Ed. 336; Dozier v. Alabama, 218 U. S. 124, 30 S. Ct. 649, 54 L. Ed. 965, 28 L. R. A. (N. S.) 264.

◼ Appellant assigns as error the findings and conclusions of the trial court,

to the effect that the contracts in question show on their face that they were made for the licensing of copyrighted motion picture films, hence that the anti-trust laws of the state of Texas have no application; the contention of appellant being that there was no evidence to support a finding that the films were copyrighted, or that the distributors were owners of the copyrights, if the same existed; and, furthermore, that it was wholly immaterial whether the films were or were not copyrighted as touching the right of appellees to interfere with appellant's right to deal, without interference, with the distributing companies. Appellees, on the other hand, contend that the evidence was sufficient to sustain the finding of the trial court, and that the distributors of copyrighted motion picture films had the legal right to agree with any exhibitor, that no other exhibitor would be permitted to exhibit such picture, and by the same token had the legal right to contract that no other exhibitor would be permitted to show the picture within 75 days from the date of the first exhibition, nor at a less admission fee for adult performances than 25 cents.

The finding of the trial court, in our opinion, is sustained by evidence. It is true no written copyright or transfer thereof was introduced, yet the parties throughout dealt with reference to copyrighted films. The pertinent portion of the written contract reads: "Agreement of license under copyright made between * * * Distributing Company, of * * *, hereinafter referred to as 'Distributor', Party of the First Part, and the exhibitor, hereinafter referred to as 'Exhibitor.' The Distributor grants the exhibitor and the Exhibitor accepts a limited license under the respective copyrights of the motion picture designated and described in the schedule hereof, and under the copyright of any matter included in any sound recorded therewith to exhibit,' etc."

█ In this situation, what is the legal status? The leading case on the subject in this state is Coca-Cola Co. et al. v. State, 225 S. W. 791, 793, by the Austin Court of Civil Appeals. The facts in that case are, in short, that: the Coca-Cola Company owned a formula for the manufacture of a basic syrup and a beverage therefrom known as "Coca-Cola"; and likewise owned a trade-mark, duly registered, named "Coca-Cola," exclusively applied to the beverage and basic syrup. The company granted the Coca-Cola Bottling Company the exclusive right to manufacture Coca-Cola in the state of Texas, and to sell same in the bottles and under the trade-name of "Coca-Cola," and the bottling company was also permitted to make similar contracts with local bottling companies in defined territories, subject to the approval of the parent company. The bottling company made such contracts with numerous local bottling companies. The validity of these agreements was challenged by the state, as violative of the anti-trust laws. The Austin Court of Civil Appeals disposed of the case in an outstanding opinion by Judge Jenkins, who, among other things, said: "The owner of a patent right, copyright, or trade-mark, having the exclusive right to manufacture and sell the article protected thereby, and being under no legal obligation to grant such right to another, may impose upon his assignee such restrictions as he may see proper, and to which his assignee will agree, including the price at which the article may be sold, the territory in which it may be manufactured and sold, the material that may be used in its manufacture, or in connection therewith. Bement & Sons v. Harrow Co., supra, 186 U. S. 70, 22 S. Ct. 747, 46 L. Ed. 1058; Coca-Cola Co. v. Bennett [(C. C. A.) 238 F. 513], supra; Clark v. Cyclone Woven-Wire Fence Co., 22 Tex. Civ. App. 41, 54 S. W. 392; Bauer & Cie v. O'Donnell, 229 U. S. 1, 33 S. Ct. 616, 57 L. Ed. [1041], 1046, 50 L. R. A. (N. S.) 1185, Ann. Cas. 1915A, 150; Victor Talking Machine v. Straus (D. C.) 222 F. 524. * * * There is, however, a marked distinction between the sale of an article, the manufacture of which is protected by a patent or copyright, or the right to use a trade-mark in connection with the sale thereof, and the sale of the right so secured. In the one case, the finished article ready for commerce is sold. In the other case, nothing tangible is sold, but only the right to produce and sell such tangible article; in other words, the right to use the exclusive privilege which has been granted to the owner of the patent, copyright, or trade-mark, which, as we have said, may be granted upon such terms as the parties may agree upon, or, failing such agreement, may be withheld altogether. The right of the owner of property to dispose of same upon such terms as he may see proper is universal. The right to fix the terms upon which another (his vendee) may dispose of his property is deemed as

being a restraint upon the freedom of trade. A trade-mark, patent, or copyright is property, in the sense that it has a commercial value, and may be sold as other property, but it is not an article of commerce in the sense that it may be consumed by the purchasing public. However valuable it may be to its owner, it is nothing more than a privilege, valuable because of its exclusiveness. 'The property (in a trade-mark) is the use.' Delaware & Hudson Canal Co. v. Clark, 13 Wall. 311, 20 L. Ed. [581], 583. The sale of a trade-mark is nothing more than a license from the owner to use the same; hence his right to impose restrictions upon such license." In the later case of Metro-Goldwyn-Mayer Distributing Corp. v. Cocke, 56 S.W.(2d) 489, 491, the Amarillo Court of Civil Appeals had under consideration a similar contract, with reference to which Chief Justice Hall said: "The record shows that the films or photoplays designated in the contract had been copyrighted. The appellee, by exceptions, insisted that the contracts sued upon were void because, by their terms, they violated both the national and state anti-trust laws. The court correctly overruled these exceptions because the anti-trust laws do not apply to copyrights and for the further reason that a violation of the anti-trust laws by a corporation is not available as a defense to a person dealing with such corporation to release him from liability for debts incurred or contracts creating debts separable from the trust combination. Coca-Cola Co. v. State of Texas (Tex. Civ. App.) 225 S. W. 791; Clark v. Cyclone Woven Wire Fence Co., 22 Tex. Civ. App. 41, 54 S. W. 392; Bauer & Cie v. O'Donnell, 229 U. S. 1, 33 S. Ct. 616, 57 L. Ed. 1041, 50 L. R. A. (N. S.) 1185, Ann. Cas. 1915A, 150; Columbia Pictures Corp. v. Bi-Metallic Inv. Co. (D. C.) 42 F.(2d) 873." We, therefore, overrule the contention of appellant in regard to this matter.

As before shown, the trial court held, "That the National Recovery Act for the motion picture industry furnishes a remedy to the plaintiff." Appellant challenges the correctness of this holding, contending that the National Industrial Recovery Act furnishes no relief whatever.

Article 5, subdivision E, part 3, § 1, of the National Industrial Recovery Act [Motion Picture Code] provides: "No exhibitor shall fail at all times to maintain the minimum price of admission specified in any contract licensing the exhibition of any motion picture during the exhibition thereof. This section shall not be deemed to prohibit exhibitors from reducing or increasing their admission scales as they see fit, except as may be prohibited by exhibition contracts."

After the Code was adopted, appellant and each of the appellee moving picture companies signed the same. It further provides that: "Complaint of any exhibitor that a competing exhibitor has committed any of the acts set forth in the following paragraphs * * * with the intention and effect of depriving without just cause the complaining exhibitor of a sufficient number of motion pictures to operate such exhibitor's theatre, shall be referred for determination to a local Grievance Board, constituted as hereinafter provided."

Paragraphs (c) and (d) read: "(c) The execution without just cause of an agreement from any distributor as a condition for entering into a contract for motion pictures that such distributor refrain from licensing its motion pictures to the complaining exhibitor. (d) The commission of any other similar act with the intent and effect of depriving, without just cause, the complaining exhibitor of a sufficient number of motion pictures to operate such exhibitor's theatre."

Appellant failed to lodge a complaint with the grievance board, but sought by suit to enjoin the other exhibitors in the respects heretofore shown, contending that the effect of the agreement called in question is to prevent appellant from obtaining sufficient pictures to operate his theaters.

The situation described in the pleadings of appellant, in our opinion, is just such as is provided for in the National Industrial Recovery Act, and, that the controversy should have been first submitted for determination to the local grievance board organized thereunder. It is well settled that, where contracting parties either agree or are required by law to resort to a designated tribunal for the adjustment of controversies, they must exhaust such remedy before resorting to the courts for redress. St. Louis B. & M. Ry. Co. v. Booker (Tex. Civ. App.) 5 S.W.(2d) 856–859; Caulfield v. Yazoo, etc., Co., 170 La. 155, 127 So. 585, and authorities cited; Harrison v. Pullman Co. (C. C. A.) 68 F.(2d) 826; Cousins v. Pullman Co. (Tex. Civ. App.) 72 S.W.(2d) 356. We therefore overrule

appellant's contention in regard to this matter.

We do not deem it necessary to determine whether appellant made a sufficient showing of probable damage as to justify injunctive relief, but for reasons hereinbefore stated, affirm the judgment of the trial court.

Affirmed.