## UNITED STATES v. INTERSTATE CIRCUIT, Inc., et al.

### No. 3736—992.

District Court, N. D. Texas, Dallas Division.
Sept. 25, 1937.

Homer Cummings, Atty. Gen., Robert H. Jackson, Asst. Atty. Gen., Berkeley W. Henderson, Paul Williams, and Wendell Berge, Sp. Assts. to Atty. Gen., and Clyde O. Eastus, U. S. Atty., and John A. Erhard, Asst. U. S. Atty., both of Dallas, Tex.

Thompson, Knight, Baker, Harris & Wright, of Dallas, Tex., for respondents.

ATWELL, District Judge.

Complainant alleges: That the Interstate Circuit, Inc., and the Texas Consolidated Theatres, Inc., are Delaware corporations, with their principal place of business in the Majestic Theatre building, Dallas, Tex. That Karl Hoblitzelle and R. J. O'Donnell are residents of the city of Dallas. That Paramount, Vitagraph, RKO, Columbia, United Artists, Universal Film Exchanges, Inc., and Twentieth Century Fox, are corporate entities existing under and by virtue of laws of states other than Texas. That Metro-Goldwyn-Mayer Distribution Corporation of Texas and Twentieth Century Fox Film Corporation of Texas are Texas corporations, having their principal places of business in Dallas.

That the Interstate Circuit operates forty-three motion picture theatres in the cities of Dallas, San Antonio, Fort Worth, Galveston, and Houston. That the Texas Consolidated Theatres operates sixty motion picture theatres in the towns of Abilene, Amarillo, Breckenridge, Brownsville, Brownwood, Corsicana, Denison, Denton, Eastland, El Paso, Harlingen, McCauley, Mercedes, Mexia, Paris, Ranger, Temple, Tyler, Vernon, Waco, and Wichita Falls, Tex., and six in Albuquerque, N. M.

That Hoblitzelle is the president of both Interstate Circuit and the Texas Consolidated Theatres, and O'Donnell general

manager of each. That they are in active charge of the management and operation thereof. They and the two corporations just mentioned are called exhibitor respondents.

The other respondents are engaged in the business of distributing motion picture films in interstate commerce throughout the United States, including the states of Texas and New Mexico. In such operation they solicit from exhibitors of motion pictures in Texas and New Mexico applications for licenses to play them; forward such applications to their respective principal offices in the city of New York; grant there such of said applications as they see fit, ship the films from laboratories located in certain states outside of Texas and New Mexico to the film exchange in Texas operated by each of said distributors nearest the location of the particular exhibitor; delivery by such exchange of said films to the exhibitor for exhibition; collection by the exchange of the rental charge for such exhibition as is provided in the license therefor; repossession by the exchange of the film following the exhibition; delivery of said film to other exhibitors in the same locality, pursuant to similar licenses; and following the exhibition of the film in the territory of Texas and New Mexico, served by such exchanges, the reshipment thereof to said laboratories located outside of Texas and New Mexico.

That the respondent distributors controlled more than 80 per cent. of the high-class feature films available for exhibition within the United States that were licensed and distributed in interstate commerce, including Texas and New Mexico.

That motion picture theatres are generally classified as first run houses, meaning the theatre giving the first exhibition in the city or locality, and subsequent run houses, meaning theatres which exhibit pictures which have been previously exhibited or run, one or more times, in the same city or locality. That higher rentals are charged to exhibitors for first run pictures, and greater revenue is derived by the exhibitor for such first runs, than from second or subsequent runs, in the same locality. That the appeal to the public of second or subsequent run houses arises because of the low admission charge and because it is sometimes customary for such houses to offer at the same showing two feature films for the same price of admission.

That the Interstate Circuit, Inc., operates first run theatres in Dallas, Houston, San Antonio, Fort Worth, Austin, and Galveston, the largest cities in Texas, at which they charge, after 6 o'clock in the evening, a regular admission price of 40 cents or more per adult. That the Texas Consolidated Theatres, Inc., operate first run houses in Waco, Wichita Falls, Tyler, Amarillo, El Paso, Tex., and Albuquerque, N. M., where the regular admission price, after 6 o'clock p. m. is 40 cents or more for each adult. That the Interstate Circuit, Inc., and the Texas Consolidated Theatres, Inc., operate second and subsequent run theatres in all of the towns mentioned.

That numerous other persons, firms, and corporations also operate second and subsequent run houses in the same towns at which the regular admission price after 6 o'clock in the evening for an adult was 20 cents or less, and often exhibited two feature films at the same showing, for the single admission price. That such exhibitors were able to secure from the distributor different feature films in the ordinary and customary manner of business, without restraint or restrictions as to how they were to be exhibited or as to the prices to be charged. That the admission charged by them and the exhibition of two feature films for the same price enabled them to conduct their respective businesses with profit, and to the satisfaction of the public.

That Interstate Circuit and the Texas Consolidated Theatres, for several years, have enjoyed a virtual monopoly in the business of first run exhibition in the cities of Dallas, Houston, San Antonio, Fort Worth, Austin, Galveston, Waco, Wichita Falls, Tyler, Amarillo, El Paso, Tex., and Albuquerque, N. M., and have been in active competition in the business of second or subsequent runs with the other persons, firms, and corporations similarly engaged in the towns heretofore mentioned.

That since April, 1934, the respondents have been engaged in a combination, conspiracy, and agreement to restrain trade or commerce in motion picture films and to monopolize and attempt to monopolize their exhibition in said states of Texas and New Mexico. That the plan for effecting such combination, agreement, and conspiracy was and is that the exhibitor respondents, being the largest licensees for first run, from the distributor respondents, and knowing that no person operating a second or subsequent run house in any one

of the cities where the respondents operate first run houses could conduct his business successfully without exhibiting some feature films distributed by some or all of the distributor respondents, and in order to strengthen their monopoly on first run exhibitions, in said towns, and to further their attempts to monopolize said business in second and subsequent runs, would advise the distributor respondents that, unless they would insert in all licensing agreements with those operating second or subsequent run in said cities for the season 1934–35, and for seasons subsequent thereto, provisions requiring said persons to charge for every feature film that had been exhibited first run in the same city for a night adult admission price of 40 cents or more, an admission price, after 6 o'clock in the evening, of not less than 25 cents for each adult, and to refrain from showing any of said feature films, so licensed, as a part of the double feature program for the same price of admission, and that if the distributor respondents did not agree to so contract, that the exhibitor respondents would no longer attempt to maintain a night adult admission price of 40 cents, or more, for first run feature films thereafter licensed. That this was for the purpose and with the intent of inducing the distributor respondents to join in and assist exhibitor respondents in carrying out said unlawful combination, agreement, and conspiracy. That upon receipt of such notice the distributor respondents agreed to join in the unlawful combination, agreement, and conspiracy, and to impose the restrictions requested upon persons, firms, and corporations to whom they granted licenses to operate second and subsequent runs, in said cities, and in pursuance thereof they did require all such persons who sought licenses for the exhibition of feature films for the season of 1934–35, in second or subsequent run theatres, located in said places, to agree in said licenses to charge for every feature film that had been exhibited first run, in the same city, for a night admission price of 40 cents, or more, after 6 o'clock in the evening, not less than 25 cents for each adult, and not to exhibit any of such films as a part of a double feature program, for the same price of admission. That said restrictions were imposed by the distributor respondents for the seasons 1934–35, 1935–36, 1936–37, and unless restrained will be imposed for subsequent seasons. That those who operate second or subsequent run theatres, in said

cities, have been restrained and forced to agree to said restrictions and have in fact accepted licenses containing said restrictions. That the effect of such restrictions in admission price and double featuring has been to (a) drive out of business some of such operators because of the unwillingness and inability of their customers to pay such increased price, and because they can no longer offer double features; (b) to cause other persons to sustain losses or reduced revenue; (c) to interfere with the free exercise of the right of such persons, to engage in interstate trade and commerce in motion picture films; (d) to unreasonably restrain trade and commerce in motion picture films; (e) to subject the attending public to the evils incident to the restraint of competition among exhibitors of motion picture films; (f) to strengthen the monopoly of the exhibitor respondents; (g) to aid the attempt of the exhibitor respondents to establish a monopoly in the business of operating second and subsequent run theatres.

Complainant then advises the court that, unless the respondents are enjoined, they will continue to engage in such unlawful practices, with the result "that the monopoly and attempted monopoly of the exhibitor respondents will be strengthened and that trade and commerce in motion picture films will be restrained by the requirements as to minimum admission prices and double featuring imposed upon all persons, firms or corporations, engaged in, or, attempting to engage in the business of operating second or subsequent run theatres in the cities where the exhibitor respondents now operate."

The prayer asks for a declaration that provisions in licensing agreements between distributor respondents and those operating second or subsequent run theatres in the cities mentioned, which restrict the price of admission and the right to exhibit double features, shall be adjudged unlawful and void, and that the distributor respondents be perpetually enjoined from inserting in any future licensing agreement any such provisions.

The respondents' answers cover about sixty pages, but, when taken in connection with the agreed statement of facts subsequently filed, their contentions, boiled down, are that they had no thought of monopoly nor of doing anything unlawful. That they were operating under United States copyright laws, and in insisting up-

on certain contracts with reference to the first run admission and the second and subsequent runs, and feature provisions, that they had a lawful right to seek such stipulations. They definitely and strenuously deny any intent or attempt to combine or conspire or confederate in any illegal or improper manner.

The agreed statement of facts sets forth in detail the names of feature pictures during the various seasons. That the distributor respondents had released and distributed 75 per cent. of first class feature motion picture films produced in the United States; the number of releases by distributors other than themselves; the number of pictures played in the A houses at 40 cents or more by the exhibiting respondents which came from the distributing respondents. That feature films for exhibition in the A houses at the high price cost the exhibitor from $1,500 to $5,000, and that subsequent runs average between twenty and thirty dollars, and that the total license fees paid by the Interstate Circuit to the distributor respondents for the 1934–35 season was $944,452.85; for 1935–36, $1,012,149.20, and that the Texas Consolidated Theatres, Incorporated, paid to the same distributors for the respective years mentioned $516,337.26 and $563,013.48. That the second run theatres of the two last mentioned corporations paid to the distributor respondents for second runs during the same seasons, respectively, by Interstate, $133,366.73; and $182,751.50, by Texas Consolidated, $78,526.42, and $87,960.35. That the total amount paid by all other exhibitors to the respondent distributors in the cities in which the Interstate operated, for the year 1934–35, was $369,594.72, and 1935–36, $354,771.50. While all other exhibitors in the cities where the Texas Consolidated operated paid to the respondent distributors for the same seasons $47,928.22 and $31,013.27, respectively.

The agreed statement takes up various theatres in the cities in question showing the prices charged prior to the alleged unlawful imposition of the restrictions and the prices paid after such restrictions went into effect. Much of the oral testimony was offered along the same lines. It suffices to say that several from Houston, Dallas, and Fort Worth testified that prior to the contract of 1934–35 they ran picture theatres in which their maximum charge was 10, 15, and 20 cents for adults at night.

That after the restrictions, if they used feature pictures which had theretofore been exhibited at 40 cents or more, they were required to contract for them with a stipulation that they would not charge less than 25 cents, nor run two of them as a double feature at the same admission price. This testimony was not very satisfactory. Most of it came from what the witnesses called poor sections of the three cities. One witness said that customers declined to pay 25 cents for a show in a "fifteen cent joint." Some said that their customers were very poor and could not afford to pay 25 cents. One of them was forced out of business and one other was going some of the time and closed down some of the time. This testimony, taken as a whole, however, showed a complete deprivation of the poor theatres, which cater to the poor people, in those particular sections of the cities, of the best films. It also showed that this resulted from the required increase of admission and loss of double feature.

Testimony was offered for the respondents, on the other hand, to the effect, and from themselves as well as from competitors, that the increase of the admission price to 25 cents for this class of entertainment had resulted in increased profits and not to a loss of business, nor any other bad result. Without naming the witnesses, and placing them in the category in which they saw fit to speak, I think that about as much was said upon one side as upon the other, but those who were in the lower scale, if we may use that phrase in the picture business, with one exception, claimed that the practice was injurious to them.

The agreed statement, as well as all of the testimony, indicates beyond peradventure that a cheap second or subsequent run destroys the earning capacity of the first run house, and therefore interferes with the return to the film producer.

It must be conceded that, since films are copyrighted, the owner thereof has the right, under our laws, to exhibit them, or to license their exhibition, at such prices or in such manner as to him may seem appropriate. This well-defined right, however, will not justify his agreeing or combining with another person in order to deprive a third person of a complete freedom of contract. The Copyright Statute (17 U.S.C.A. § 1 et seq.) and the Anti-Trust Statute (15 U.S.C.A. § 1 et seq.) are both in effect and vitally necessary.

Straus v. American Publishers' Ass'n, 231 U.S. 222, 34 S.Ct. 84, 58 L.Ed. 192, L.R.A. 1915A, 1099, Ann.Cas.1915A, 369.

■ While it is doubtless true that the exhibition, itself, of the moving picture is state commerce, and beyond the finger of regulation as interstate commerce, it is also true that the film without the right of exhibition would be useless in either intra or inter state economics. Therefore, a contract made in violation of the national antitrust laws may not be unchallenged because the last step in its fruition is intrastate in character. This is not placing the finger of the national government into the affairs of the state. It is saving national authority from paralysis, when the authority operates upon that which fruits at the end of an interstate trip. A contract for a film would be valueless unless the film were to be produced. If its production may be hampered, then, to that extent, at any rate, its value is lessened. It is what thinkers call a restraint. It is the sort of interference that the law seeks to prevent—that the law penalizes.

■ The owner of the copyrighted article may contract with the exhibitor, without the intervention of any third mind, for full and free protection, both as to price and manner of use, but when the outside mind, with an interest to serve, steps into the picture—the contracting room—and interjects, persuades, and coerces the copyright owner to join with it in its protection, as against the party to whom the copyright owner is selling or contracting, then and in that event there are two or more persons engaged on the side of the copyright holder, when the law gives only one privileges and immunities. Such a unity of minds, if it be in restraint of interstate commerce, is illegal. The copyright privileges does not save it from illegality.

■ The sharp issue—the battleground— of this case, is whether the respondents conspired together to bring about the fixing of the minimum 25-cent charge by the subsequent exhibitor and the destruction of the practice of double featuring.

The respondents O'Donnell and Hoblitzelle and the Dallas agents of the distributor respondents all strenuously contend that there was no conspiracy or agreement. The facts show so conclusively that one would be bold, indeed, to say otherwise, that Hoblitzelle and O'Donnell had discussed the formulation of some plan where-

by their interests could be protected from cheap subsequent runs. They had taken over a large string of valuable and yet, theretofore, unsuccessful theatres, from the bankruptcy court. The business was at a low ebb. They went to a California convention where at least one official was broached with reference to such a plan and in due time O'Donnell wrote eight letters, exact in language and proposal. Those letters were addressed to the local agencies of the distributor respondents. Those letters demanded a reply. Those letters contained the threat that is set out in the complainant's bill. At least two of such agents objected to the plan when they transmitted the letters to their principals in New York. In due time another letter was written, in substance, affirming the April determination. And when the contracts of the eight respondent distributors, for that particular year, with the respondent exhibitors, appeared, the identical language which was demanded by O'Donnell in his original April letters was in each. That O'Donnell and Hoblitzelle, and the local agents testified that in the making of these particular contracts neither of their competitors were present is immaterial. In giving their reasons why such competitors were not present, they include the suggestion that the terms—amount of rental and the number of films to be used—were matters that they felt should be known only to themselves and not divulged to a competing distributor, but this does not answer the inevitable conclusion that the provisions as to subsequent run admission price and double features were in no sense protested. Those positions were well known in all of the exchanges, and to all of the agents. So the other provisions of the contract are the ones that they desired to keep secret. When the contracts came out completed, they were identical as to the provisions that were thought to be important for the business prosperity of the distributor and the respondent exhibitor, so far as this case is concerned. To hold otherwise would be to ravish the power to reason. Would be to overthrow and disregard syllogism—cause and effect. Would be to disregard the determination of the different producers to do that which they considered a salvation for their own business. I believe that the record justifies the conclusion that the months over which the 1934-35 contracts were incubated were, to some extent, occupied in the reconciliation of the differences between the eight distributors,

as evidenced by some of their local representatives, when the proposition was first broached, to the point where all agreed that such provision might go into their contracts with the respondent exhibitors.

In addition to that testimony is the evidence of certain so-called independents who met in convention in Dallas, and who were constantly complaining to the various film exchange agencies about this new provision and who were sent to Hoblitzelle, in the hope that they might secure from him—not from their companies—some relief from those provisions.

The conviction is inescapable that there was such an agreement. Beyond even the citing of testimony is the irrefutable further fact that such contracts as the exhibitor respondents made with each of the distributor respondents was, itself, in violation of the Sherman Anti-Trust Law (15 U.S. C.A. § 1 et seq.)

I do not take any stock in the suggestion that film agents had their offices in what is called film row. The testimony does not show that they were even in the same building. But, even if they were, that makes no difference, because the doctors in Dallas are in the Medical Arts building, but that is not legally significant. Because the hog raisers and cattle shippers may be found at the packing houses, or that all of the large department stores are in the center of the cities, does not mean that there is any combination between them. Such inferences as that are beyond the pale of reason. Deductions in this case grow out of actual facts of agreement and not out of such shadows.

It is not a case of all persons in a burning building with but one exit making for that exit upon the discovery of the peril. No deduction of an agreement could be made from that action. It is rather the case of persons in a building with many exits who upon the coming of a certain moment all make for the identical exit, and, when the investigation is made, it is discovered that each had been told to make for that exit at that particular time, and, if he did not do so, some penalty would be visited upon him.

After all, a contract—agreement, conspiracy—is merely the meeting of the minds. Such meeting may be evidenced by a written instrument, or by identical action. This case exhibits an unanimity of action, at a given time, with reference to the identical matter. And the testimony irrefutably establishes the fact that the same action was suggested to each party who thereafter so acted; that prior to that each had been going a different way—seeking a different exit—to continue the metaphor.

In reaching the conclusion which seems to me inescapable, that they acted together, I have applied, in thought—careful thought—the rules with reference to the burden of proof, and the giving of the respondents the benefit of the rule which requires the establishment of such an agreement to the exclusion of every reasonable hypothesis of innocence.

The citizen has the right to go to another citizen to make a contract and to have that other citizen free from any inhibiting prior agreement to limit the rights of him who seeks. The subsequent small theatre exhibitor who wanted the right to show a class A film at 10 or 15 or 20 cents has a right—that right which belongs to every free man—to contract with the owner of that film, free to exercise his own judgment. This evidence shows that no such subsequent run exhibitor had a field of that sort with the distributor defendants. There had already been a pre-occupation of this very field of agreement. Some of his rights had already been taken away from him. It differs from the exercise of the distributor of the right to refuse to deal at all.

We feel justly proud of our large industries—of our large theatres—of their beauty and fascinating entertaining qualities and conveniences for rest, entertainment, and knowledge. We enjoy the uplift of the fine exhibition. Constantly we view with concern the congregation of the less fortunate, who, for the time, are unable to enjoy the higher-priced luxuries. We regret that they do not always have the advantage of the best thought, the best example—that which inspires and inspirits—that which elevates. We recognize that the moving picture is the greatest school the people have. We must not, by any sort of a construction of contract or law, keep away from them that which they should have, and which we enjoy, if they are entitled to it.

True it is that all may not wear silk or jewels, yet it is equally true that all may desire to do so. True it is that all may not sleep in the best hotels, nor sit in the best seat, nor witness the best of entertainment, under the best physical appliances, but those who have such advantages should

be quick to see that they do not take part in the maintenance of any contract or any system which deprives those who do not have those privileges of the right of contract which would give them the best amusement, and the finest instruction, as well as that which will assist them in life's battle for happiness. Finery and convenience may not be available for all, but that does not mean that all do not thirst for it. That one may be satisfied with water that is tainted, because unable to get the purest, is no legal reason why the purest should be denied, if, forsooth the law can prevent such denial. That one may seek amusement in a hovel—a bad smelling, poorly seated, cramped exhibition hall—is no insuperable obstacle to the furnishing of amusement that is not also ill-odored and character debasing.

■ One of the respondents, Mr. Hoblitzelle, is one of the city's finest characters. He sought legal advice before he began the crusading for these contracts. By his life he has evidenced a deep interest in those who do not have. The conclusion that this court reaches in this case, ultimately, is not a criticism of him nor a condemnation of him. Good motives, good intentions, are not a defense to actions brought for violations of this statute. Nor is one's desire to have his own business prosperous a defense. Nor is the desire to see those who join in the formation of the plan, prosperous, a satisfactory answer to the negations of the law.

The result of this transaction was to take from others that which they have the right to believe and to know shall not be taken. It is as certainly theirs as is the right to breathe—the right to live.

A great many cases have been collated, in brief and argument, by the thoughtful gentlemen who have so well conducted this case, both for the complainant and the respondents. I cite the following, as illuminating the questions that have been somewhat summarily dealt with in this opinion: United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362; Boston Store v. American Graphophone Co., 246 U.S. 8, 38 S.Ct. 257, 62 L.Ed. 551, Ann. Cas.1918C, 447; Board of Trade of City of Chicago v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683, Ann.Cas.1918D, 1207; Paramount Famous Lasky v. U. S., 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145; Dr. Miles Medical Co. v. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502;

Standard Sanitary Manufacturing Co. v. U. S. of America, 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107; Addyston Pipe & Steel Co. v. U. S., 175 U.S. 211, 20 S.Ct. 96, 44 L. Ed. 136; Binderup v. Pathé Exchange, 263 U.S. 291, 301, 44 S.Ct. 96, 97, 68 L.Ed. 308; Straus v. American Publishers', 231 U.S. 222, 34 S.Ct. 84, 58 L.Ed. 192, L.R.A.1915A, 1099, Ann.Cas.1915A, 369; United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989; Youngclaus v. Omaha Film Board of Trade (D.C.) 60 F.(2d) 538; Buck v. Hillsgrove Country Club (D.C.) 17 F.Supp. 643; Federal Baseball Club v. Nat. League, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898, 26 A. L.R. 357; Mutual Film Corp. v. Industrial Comm. of Ohio, 236 U.S. 230, 35 S.Ct. 387, 59 L.Ed. 552, Ann.Cas.1916C, 296; Glass v. Hoblitzelle (Tex.Civ.App.) 83 S.W.(2d) 796; Union Pacific Coal Co. v. United States (C.C.A.) 173 F. 737; Pennsylvania Railroad Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819; Boynton v. Fox West Coast Theatres Corp. (C.C.A.) 60 F. (2d) 851; Brooks v. City of Birmingham (D.C.) 32 F.(2d) 274; Hart v. B. F. Keith Vaudeville Exchange (C.C.A.) 12 F.(2d) 341, 47 A.L.R. 775; Foster & Kleiser Co. v. Special Site Sign Co. (C.C.A.) 85 F.(2d) 742; Metro-Goldwyn-Mayer Dist. Corp. v. Bijou Theatre Co. (C.C.A.) 59 F.(2d) 70; Carbice Corp. v. American Patents Development Corp. & Dry Ice Corp. of America, 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819; Federal Trade Commission v. Sinclair Ref. Co., 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746.

It follows that the practice complained of is an illegal one, and that the respondents should be restrained from continuing to follow it.

■ Equity will not do a useless thing. There is no testimony in this record with reference to the agreements subsequent to 1934–35, except that the restrictions of those years continue. It has been assumed by both sides that such contracts contain the same restrictions, and therefore suffer the same frailty as to legality. The distributor respondents have the legal right to contract for the exclusive exhibition of their copyrighted pictures to the respondent exhibitors. But, if they should do that as a result of a common understanding, that, too, would be illegal. If they do that without any such common understanding or agreement, it is free from condemnation, so far as the law is concerned. They must

not, in their contracts with the exhibitor respondents, contract away their right to contract, completely and fully, with other exhibitors, if they contract at all. Therefore, in shaping the decree, these suggestions will be followed by the attorneys in declaration of illegality and restraint.